UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTHONY CATRON, CHARLES
HARGIS, MICHAEL LILE,
FERDINAND LUPPERGER, JO ANNE
REYNOLDS, and WILLIAM
SHUMATE, on behalf of themselves          Case No:
and all others similarly situated,

      Plaintiffs,

v.

CITY OF ST. PETERSBURG,

      Defendant.

**COMPLAINT FOR DECLARATORY AND
<u>INJUNCTIVE RELIEF/CLASS ACTION</u>**

**PRELIMINARY STATEMENT**

1.      This is a class action brought on behalf of homeless residents of the City

of St. Petersburg (City) for declaratory and injunctive relief pursuant to 42 U.S.C. §

1983 for past and ongoing injury to Plaintiffs' rights guaranteed by the First, Fourth,

Eighth and Fourteenth Amendments of the U.S. Constitution, and Article I, § 9 of the

Florida Constitution.

2.      Homeless residents are those individuals who lack a fixed, regular, and

adequate nighttime residence.  This includes individuals who are sharing the housing

of other persons due to loss of housing, economic hardship, or a similar reason; are

living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative

1

adequate accommodations; are living in emergency or transitional shelters; have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings; or are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings.

## JURISDICTION

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) & (4) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202.

4.      This Court has supplemental jurisdiction over Plaintiffs' state constitutional claims pursuant to 28 U.S.C. § 1367(a).

## VENUE

5.      Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and M.D. Loc. R. 1.02.  Plaintiffs reside, Defendant is located, and all of the acts and omissions complained of herein occurred and will continue to occur in the Tampa Division of the Middle District of Florida.

## NAMED PLAINTIFFS

6.      Plaintiff ANTHONY CATRON is a homeless resident of the City.

7.      Plaintiff CHARLES HARGIS is a homeless resident of the City.

8.      Plaintiff MICHAEL LILE is a homeless resident of the City.

9.      Plaintiff FERDINAND LUPPERGER is a homeless resident of the City.

2

10.     Plaintiff JO ANNE REYNOLDS is a homeless resident of the City.

11.     Plaintiff WILLIAM SHUMATE is a homeless resident of the City.

**DEFENDANT**

12.     Defendant City of St. Petersburg (City) is a municipal entity organized under the laws of the State of Florida, with the capacity to sue and be sued.

13.     The City Commission sets final policy on the creation and adoption of city ordinances.

14.     Defendant City is the legal entity responsible for the police department known as the City of St. Petersburg Police Department (SPPD). This police department has the traditional authority of police forces to enforce Florida statutes and City ordinances.

15.     The City is sued for injunctive and declaratory relief on the basis of acts of officers, agents and employees of SPPD and the City, which were taken pursuant to official policy, practice and/or custom.

16.     At all times relevant herein, the officers, agents, and employees of SPPD and the City were acting under color of state law.

**CLASS ACTION ALLEGATIONS**

17.     Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the Named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

18.     The proposed class consists of all current and future homeless residents in the City who have been or will be subjected to the City's anti-homeless policies

3

including having property confiscated, being issued a warning or notice of violation, and being cited, arrested, and/or ordered to comply under threat of citation or arrest.

19.     For purposes of the class definition, the City's "anti-homeless policies" include: (a) arresting, citing, warning and/or ordering to comply under threat of arrest for any of the following violations: trespass after warning on public property, City Code § 20-30 and Fla. Stat. § 810.08 and 810.09; outdoor storage on public property, City Code § 8-321; sleeping in or on right-of-way, City Code § 20-74; sleeping, lying or reclining in rights-of-way during daylight hours, City Code § 20-82; and public urination/defecation, City Code § 20-123 and Fla. Stat. § 877.03; (b) property sweeps conducted pursuant to § 8-321; (c) stopping homeless individuals and asking for identification; (d) searching the possessions of homeless individuals; and (e) directing homeless individuals to leave public areas.

20.     Numerosity: The Plaintiff class is so numerous that joinder of all its members is impracticable.  According to the 2009 Annual Homeless Count and Survey conducted by the Pinellas County Coalition for the Homeless[1] (PCCH 2009 Survey), there are an estimated 6235 homeless individuals (both sheltered and unsheltered) who live in Pinellas County.  Of the 2232 unsheltered individuals, approximately 45.6%

---

[1]     This Survey reports the results of the annual Point-in-Time Count which is conducted during the last week of each January to provide statistically reliable estimates of homeless persons in sheltered and unsheltered conditions in Pinellas County.  A copy of the PCCH 2009 Survey is attached as Exhibit A.

live in the City.[2]  Many of the homeless individuals who live in the City have been or will be subjected to the City's anti-homeless policies.  Therefore, joinder of all parties is impracticable.

21.   Commonality: There are questions of law or fact that are common to all Named Plaintiffs, as well as to putative class members, including:

a.  Whether § 8-321 of the City Code is unconstitutional on its face and as-applied to Plaintiffs and putative class members in violation of the Fourteenth amendment of the U.S. Constitution;

b.  Whether § 20-30 of the City Code is unconstitutional on its face and as-applied to Plaintiffs and putative class members in violation of the First and Fourteenth amendments of the U.S. Constitution;

c.  Whether § 20-82 of the City Code is unconstitutional on its face and as-applied to Plaintiffs and putative class members in violation of the Fourteenth amendment of the U.S. Constitution;

d.  Whether Defendant's policy, practice and/or custom of harassing, arresting, and incarcerating involuntarily homeless people for life-sustaining activities such as public urination/defecation at times and places where there are no public bathrooms open and accessible to homeless individuals constitute punishment of Plaintiffs and putative class members based on their status as homeless persons and,

---

[2]    The PCCH 2009 Survey does not provide an estimate of the total number of homeless individuals (sheltered and unsheltered) who live in the City.  See Ex. A.

5

as such, is cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution;

e.   Whether Defendant's policy, custom and/or practice of: (a) stopping Plaintiffs and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave under threat of arrest public places where they are lawfully allowed to be in a concerted effort to intimidate homeless people to depart the area violate the Fourth Amendment rights of Plaintiffs and the putative class members to be free from unreasonable searches and seizures, as guaranteed by the U.S. Constitution;

f.   Whether Defendant's policies, practices and/or customs violate Plaintiffs' and putative class members' right to equal protection under the law in violation of the Fourteenth Amendment of the U.S. Constitution; and

g.   Whether Defendant's policies, practices and/or customs violate Plaintiffs' and putative class members' right to travel in violation of the Fourteenth Amendment of the U.S. Constitution and Article I, § 9 of the Florida Constitution.

The questions of law and fact common to all members of the putative class predominate over any question affecting only individual members.

22.   Typicality: The claims of the Named Plaintiffs are typical of the claims of the putative class as a whole in that the Named Plaintiffs and putative class

members have been arrested and/or harassed in the past and/or expect to be arrested and/or harassed in the future by Defendant City for engaging in ordinary and essential activities of daily living.

23.     Adequate representation: The Named Plaintiffs will fairly represent and adequately protect the interests of the members of the putative class as a whole.  The Named Plaintiffs do not know of any conflict of interest among putative class members. By filing this action, the Named Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated.  The relief sought by the Named Plaintiffs will inure to the benefit of members of the class generally.  The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, constitutional law, practice and procedure in the federal courts and the prosecution and management of class action litigation.

24.     Defendant's policies, practices or customs affect all members of the putative class in the same way, thereby making injunctive and declaratory relief appropriate with respect to the class as a whole under Fed. R. Civ. P. 23(b)(2).  A class action is superior to individual lawsuits for resolving this controversy.

## STATEMENT OF FACTS

25.     According to the PCCH 2009 Survey, there are 6235 homeless individuals living in Pinellas County.  This represents a 20% increase in the total number of homeless individuals from 2007.  Ex. A.

26.     Of the those individuals surveyed, 2232 are living in unsheltered situations

7

in Pinellas County, an increase of 82.7% from 2007.  *Id.*

27.    Of the 2232 unsheltered homeless individuals living in Pinellas County, 45.6% reside primarily in the City.  *Id.*

28.    Of the sheltered and unsheltered individuals surveyed in Pinellas County, 45.8% reported last having a permanent address in the City.  *Id.*

29.    The total homeless population in Pinellas County was 34% female and 68% male.  *Id.*

30.    Veterans make up approximately 18% of the homeless individuals in Pinellas County.  *Id.*

31.    While the majority of homeless individuals surveyed were between 18-64 (approximately 65%), there was a significant increase in youth homelessness reflected by the PCCH 2009 Survey with those individuals between 1-17 years of age making up 31.5% of the total homeless population in the County.  *Id.*

32.    Of the individuals surveyed, 42.8% reported having a disability of long duration.  *Id.*

33.    Approximately 86.3% of the individuals surveyed in 2009 reported lack of income/lost job and other financial reasons as their primary reason for homelessness.  *Id.*

34.    According to the City's Annual Action Plan for 2008/09, there are insufficient emergency shelter beds, transitional housing and permanent housing

available for homeless individuals in the City.[3]

35.     In its 2008 Continuum of Care Application to the U.S. Department of Housing and Urban Development (HUD)[4], the Pinellas County Coalition for the Homeless (PCCH) stated that even though the number of beds for unsheltered individuals had increased, "we have seen no decrease in the number of unsheltered individuals; the numbers continue to increase as we have lost low income housing and have experienced job losses higher than the national average." PCCH, *2008 Continuum of Care Application* at 50.

36.     Pinellas County Consumer and Justice Services compiled a recent report entitled *Chronic Minor Offenders in Pinellas County Jail.*[5]   *Pinellas Hope: Reducing Street Homelessness* at 13.

37.     The study analyzed jail data from 2005 through April 2008 and found that 3,789 unique individuals with a homeless-related address were arrested.[6]   *Id.*

38.     An analysis of the jail data for local ordinance violations revealed 3,844

---

[3]     The 2008/09 Annual Action Plan is available on the City website at http://www.stpete.org/housing/docs/Final_Consolidated_Annual_Action_Plan_for_FY_08_09.pdf.

[4]     The 2008 application is available on the PCCH website at http://www.pinellashomeless.org/information/research-documents.html.

[5]     The results of this study were discussed in a report titled *Pinellas Hope: Reducing Street Homelessness*, available on the PCCH website at http://www.pinellashomeless.org/information/research-documents.html.

[6]     Those individuals who reported an address of a homeless shelter, friend or relative, or who refused to provide an address were not counted in this analysis.

unique arrests for 1,997 unique individuals.  *Id.*

39.     The top five arresting law enforcement agencies for local ordinance violations were St. Petersburg City Police (55%), Pinellas County's Sheriff's Office (18%), Clearwater City Police (14%), Pinellas Park City Police (7%), and Largo City Police (1%).  *Id.*

40.     The cost of housing at the jail, using an estimate by the Pinellas County Sheriff's Office, is $92 per day.  This amount excludes medical costs or expenses associated with obtaining a public defender.  *Id.* at 13-14.

41.     The 3,844 local ordinance arrests accounted for 12,051 jail days and a total estimated cost of $1,108,692.  *Id.* at 14.

42.     According to the study, 152 people (8% of the total number of individuals represented by the arrest data) accounted for approximately 7,198 of the ordinance jail days (60% of the total number of ordinance jail days).  *Id.*  This averages to about 7 arrests per person, with these 152 individuals accounting for $662,216 or 60% of the total cost.  *Id.*

43.     This report demonstrated there is an average jail stay of 3.5 days for local ordinance arrests, making it difficult for homeless individuals to connect to social services and break the cycle of homelessness.  *Id.*

**Named Plaintiffs' Allegations**

**Anthony Catron**

44.     Named Plaintiff Anthony Catron was born on May 18, 1986.  He aged out

of foster care when he was 18 years old and has been homeless on and off since that time.

45.     Catron generally stays with friends or finds other shelter on a temporary basis.  When he is unable to obtain shelter, he sleeps on public streets and sidewalks in downtown St. Petersburg.

46.     On August 23, 2006, a SPPD officer issued Catron a Trespass Warning for public property (SPPD # 2006-54095)[7].  The Trespass Warning states that Catron will be subject to arrest if he is found on the following property: "all of Williams Park" and "all city parks."   The Trespass Warning states that it will remain in effect "permanently."

47.     On August 29, 2007, a SPPD officer issued Catron a Trespass Warning for public property (SPPD # 2007-194606).  The Trespass Warning fails to specifically describe the public property that is the subject of this written warning, but it states it will remain in effect for one year.

48.     Neither Trespass Warning issued to Catron states the underlying violation that authorized the police officer to issue these written warnings.

49.     Officers from the SPPD have arrested Catron for trespass after warning ten times under Fla. Stat. 810.08 and/or 810.09  for violating either one or both of these

---

[7]     Documents such as Trespass Warnings and arrest reports referenced in this complaint are in the possession, custody and control of the SPPD.  Some of these reports have been obtained by counsel for Plaintiffs pursuant to public records requests under Ch. 119, Fla. Stat.  Where available, the citations refer to either the SPPD report number, incident number and/or case number.

*Trespass Warnings* for being present in Williams Park at times when the park was open to the general public.

50.     Catron has served time in jail and been assessed court costs and fines for these arrests for trespass after warning.

51.     Officers from the SPPD have told Catron that the Trespass Warning for Williams Park applies "curb to curb."  They have told him that he is not allowed to walk on the sidewalks outside of Williams Park, use the public restrooms, or to be in any of the bus shelters outside of the park even if he were waiting for a city bus.

52.     Catron was arrested by a SPPD officer on January 30, 2008 for trespass after warning for sitting on the "retaining wall on the west portion of the park."  The arrest report states that Catron had been previously warned that the Trespass Warning "included curb to curblines of the park."  *See* SPPD # 2008-6000.

53.     Catron sometimes eats food provided by community groups to hungry and/or homeless people in public parks.  Catron must either risk arrest to obtain food from these groups or go without food he could otherwise obtain during these food sharing events.

54.     SPPD officers frequently stop Catron without reasonable suspicion of criminal activity and demand that he produce identification.

55.     SPPD have searched Catron without probable cause when they have stopped to check his identification, particularly when he did not have identification to produce to the officers.  SPPD officers have told him that he would be arrested if he

refused to let them search him.

56.     Catron has been told to leave various areas throughout the City by several different SPPD officers.  Sometimes when he has been trying to sleep on public sidewalks or other public areas in the City, he has been woken up by SPPD officers and told he needs to move to a different place or he would be arrested.

**Charles Hargis**

57.     Named Plaintiff Charles Hargis was born on July 6, 1962.  He moved to St. Petersburg in 2006.  He had an apartment but became homeless when he had difficulty finding work.

58.     When he is unable to obtain shelter, Hargis generally sleeps on public streets and sidewalks in downtown St. Petersburg.

59.     On May 23, 2007, a SPPD officer issued Hargis a Trespass Warning (SPPD # 2007-31670) for Williams Park.  Hargis was told he was trespassed for two years from Williams Park.

60.     SPPD officers have ordered Hargis to leave Williams Park, and they have cited and/or arrested him six different times for trespass after warning under Fla. Stat. 810.08 and/or 810.09 for being in Williams Park during times when the park is open to the general public.  Hargis has served time in jail and been assessed court costs and fines for these trespassing charges.

61.     In February 2008, a SPPD officer issued Hargis a Trespass Warning for Mirror Lake Park  (SPPD # 2008-028333).  Hargis was not charged with any crime or

13

arrested at the time, but was told he was no longer allowed in the park for one year or he would be arrested.

62.    SPPD officers have ordered Hargis to leave Mirror Lake Park, and they have arrested him for trespass after warning under Fla. Stat. 810.08 and/or 810.09 for merely being present in Mirror Lake Park at a time when the park was open to the general public.  Hargis has served time in jail and been assessed court costs and fines for this arrest.

63.    Hargis is no longer prohibited from being in Mirror Lake Park as this Trespass Warning has expired.  Hargis is still prohibited from being in Williams Park due to the Trespass Warning issued May 23, 2007.

64.    Hargis is a musician and an artist.  He likes to sit in Williams Park and Mirror Lake Park to associate with friends and play his guitar or draw.  Hargis also likes to visit the veterans' monuments in Williams Park and honor family and friends who served in Vietnam.  For the duration of the time Hargis has been banned from these two public parks, Hargis would be arrested if he went into either of these parks to engage in these innocent activities due to these Trespass Warnings.

65.    Hargis sometimes eats food provided by community groups to hungry and/or homeless people in public parks.  Hargis must either has to risk arrest to obtain food from these groups or go without food he could otherwise obtain during these food sharing events.

66.    SPPD officers have told Hargis that the Trespass Warning for Williams

Park applies "curb to curb" and that he is not allowed to stand on the public sidewalks or wait for a bus outside the park.  They have also told him that he is not allowed in the park for any reason including use of the public bathrooms inside Williams Park or he will be arrested for trespass after warning.

67.     When Hargis sleeps on public sidewalks, particularly in front of City Hall, police officers from the SPPD wake him and other homeless individuals at or around sunrise by kicking at their feet and ordering them to get up and leave the area or be arrested.

68.     On February 17, 2009, Hargis was issued a written notice entitled "Notice to The Owner and All Persons Interested in the Affected Property" ("Notice") (SPPD # 2009-010963).

69.     The Notice was issued pursuant to § 8-321 of the St. Petersburg City Code.

70.     Hargis was sitting in Mirror Lake Park with his personal belongings and his girlfriend's belongings beside him when he was issued the Notice, which was hand delivered by a SPPD officer.

71.     SPPD officers told Hargis he had "too much stuff."  Hargis was sitting with his and his girlfriend's sleeping bags, a blanket, several plastic bags that contained clothes and personal items belonging to him and his girlfriend, and his guitar.

72.     When Hargis told the SPPD officers that the items belonged to both him and his girlfriend, they asked where his girlfriend was.  He told them she had gone to

use the public bathroom.

73.   The SPPD officers told Hargis that the City had passed a new law and that they were only allowed to have two bags per person.  They said that he wasn't allowed to watch someone else's belongings and that he and his girlfriend needed to carry their belongings with them at all times.

74.   Since Hargis is homeless, he has no access to private property to store his personal belongings.

75.   Since the ordinance specifies that "[m]oving the unlawfully stored items to another location on public property shall not be considered to be removing the item from public property", Hargis can not go to any public place in the City with his personal belongings and be in compliance with the ordinance.  *See* § 8-321(d)(3).

76.   The broad definition of "store" means that if Hargis merely "set" or "placed" his guitar or sleeping bag in a city park or on a sidewalk next to him, it would be "unlawful storage" and a violation of this ordinance.  *See* § 8-321(h)(1).

77.    Hargis is faced with the choice of abandoning personal belongings that he owns or being in continuous violation of this ordinance.

78.   Hargis is afraid of having his belongings taken by the City and/or being cited or arrested for violating the ordinance.

79.   SPPD officers frequently stop Hargis without reasonable suspicion of criminal activity and demand that he produce identification.  SPPD have searched him without probable cause when they have stopped to check his identification.  Hargis

generally consents to these searches because he feels he cannot refuse.  When he has refused in the past, he has been told he would go to jail if he didn't let SPPD officers search him.

**Michael Lile**

80.     Named Plaintiff Michael Lile was born on September 22, 1952.  He is a disabled United States Army veteran.  He moved to St. Petersburg in 2002 and has been homeless on and off since the beginning of 2008.

81.     Lile sometimes stays with friends or rents a temporary place to stay when he has the money.  When he is unable to obtain shelter, Lile generally sleeps on public streets and sidewalks in downtown St. Petersburg.

82.     On April 25, 2008, SPPD officers arrested Lile for public urination early in the morning when there were no public bathrooms open, available and/or accessible to him.

83.     Lile was sleeping on public sidewalks across the street from St. Vincent de Paul and felt an urgent need to use the bathroom.  The bathrooms at St. Vincent de Paul were not open at that time and Lile was not aware of any other public bathrooms in that area.  He urinated behind some bushes while it was still dark outside at or around 6 a.m.

84.     SPPD officers arrested Lile and took him to jail for public urination.

85.     Lile was arrested under § 20-123 of the City Code (SPPD # 2008-023397).  He was sentenced to 5 days in jail, with 2 days credit for time served, for

public urination and he was assessed fines and costs.  Lile served his sentence and was released on April 28, 2008.

86.     When Lile has slept on public sidewalks in front of City Hall, he has seen SPPD officers  kick at homeless individuals' feet in the mornings and tell them that they need to get up and leave the area or be arrested.

87.     When Lile has been sitting on public sidewalks near homeless service providers such as St. Vincent de Paul, SPPD officers have told him and other homeless individuals that they need to "sit up straight" and aren't allowed to "recline" or they will be arrested.

88.     Lile does not want to be cited and/or arrested for "reclining", but is unsure what he needs to do to comply with this law.

89.     Officers from the SPPD have stopped Lile without reasonable suspicion of criminal activity and demanded he produce his identification. When Lile has been with a group of homeless individuals, police officers have asked everyone in the group to produce identification and/or police officers have singled out certain members of the group to check their identification even though they were not doing anything illegal.

**Ferdinand Lupperger**

90.     Named Plaintiff Ferdinand Lupperger was born on May 23, 1953.  He moved to St. Petersburg in 2005.  Lupperger receives Social Security Disability benefits and could not afford housing in St. Petersburg.  He was left out on the street and has been homeless since that time.

91.    Lupperger sometimes rents a motel room on a temporary basis when he is able to pay.  When he is unable to obtain shelter, he generally sleeps on public streets and sidewalks in downtown St. Petersburg.

92.    In the mornings, Lupperger has seen SPPD officers pull up in front of the public sidewalks where he sleeps in the downtown area and tell him and other homeless individuals that they need to get up and leave the area or they will be arrested.

93.    On April 7, 2006, SPPD officers issued Lupperger a Trespass Warning (SPPD # 2006-22143 & SPPD # 2006-100088) for Williams Park.

94.    As a result of this Trespass Warning, Lupperger was prohibited from returning to Williams Park for one year or he would be arrested.

95.    On April 12, 2006, Lupperger was arrested for trespass after warning (SPPD # 06-23269) under Fla. Stat. 810.08 and/or 810.09 for merely being present in Williams Park at a time when the park was open to the general public.  The arrest report states that Lupperger was "seated within park with a small group of subjects" and does not state that he was otherwise doing anything unlawful.

96.    Lupperger was sentenced to time in jail and was incarcerated for trespass after warning.  He also was assessed court costs and fines.

97.    On the morning of June 10, 2008, Lupperger was sleeping in front of City Hall and had an urgent need to use the bathroom.  There was no public bathroom open, available, and/or accessible at that time.  Lupperger tried to find a place hidden

from public view.

98.    At or around 5:32a.m. on June 10, 2008, an officer from the SPPD issued Lupperger a Notice to Appear for disorderly conduct, Fla. Stat. 877.03, for public defecation (SPPD # 2008-33762).

99.    Lupperger served jail time and was also assessed court costs and fines for this charge.

100.   On June 12, 2008, SPPD officers issued Lupperger another Trespass Warning (SPPD # 2008-034252) for Williams Park.  Lupperger is subject to citation and/or arrest for trespass after warning if he goes into Williams Park.

101.   Officers from the SPPD have told Lupperger that the Trespass Warning for Williams Park applies "curb to curb".  They have told him that he is not allowed to walk on the sidewalks outside of Williams Park, use the public restrooms, or to be in any of the bus shelters outside of the park even if he were waiting for a city bus.

102.   Lupperger has a difficult time finding a place where he is lawfully allowed to use the bathroom.  Due to his Trespass Warning , Lupperger is not allowed to use the bathrooms in Williams Park even when they are open to the general public or he would be arrested for trespass after warning.

103.   In March of 2009 Lupperger was issued a Notice to Appear for Sleeping, Lying or Reclining under § 20-82, City Code.

104.   He was sentenced, concurrent with several other charges, to pay fines and court costs and/or perform community service.

105.    Officers from the SPPD have stopped Lupperger without reasonable suspicion of criminal activity and demanded that he produce his identification. Lupperger has been searched without probable cause by SPPD officers without being asked for his consent.

**Jo Anne Reynolds**

106.    Named Plaintiff Jo Anne Reynolds was born on June 10, 1957.  Reynolds is disabled and uses a wheelchair to get around.

107.    Reynolds stays in a motel when she can afford to pay.  When she doesn't have enough money to afford a motel room, she stays on public streets and sidewalks in St. Petersburg.

108.    Reynolds receives Social Security Disability income but the monthly payments are not enough for her to pay for housing and other basic living expenses.

109.    From October 2008 to February 2009, Reynolds was staying in a motel with her boyfriend.  Since they split the costs of the motel room, they were able to stay off the streets.

110.    In February 2009, Reynolds' boyfriend did not receive his usual monthly veterans' benefits check , so they were forced to leave the motel when they ran out of money.

111.    When they left the motel, Reynolds had to leave personal belongings behind since they couldn't carry everything with them.  Reynolds fit everything she could into a bag that hangs on her wheelchair.  Reynolds' boyfriend had several bags

and he also carried blankets for Reynolds and other personal belongings she couldn't carry in her wheelchair.

112.   On February 10, 2009, Reynolds was issued a written notice entitled "Notice to The Owner and All Persons Interested in the Affected Property" ("Notice") (SPPD # 2009-9274).

113.   The Notice was issued pursuant to § 8-321 of the St. Petersburg City Code.

114.   Reynolds was sitting in her wheelchair with her personal belongings and her boyfriend's belongings on a park bench beside her when she was issued the Notice, which was hand delivered to her by a SPPD officer.

115.   The Notice stated that: "This property: 2 duffel bag (1 grn 1 camo), 1 blue backpack is unlawfully stored upon public property known as Williams Park must be removed within thirty-six (36) hours from the date and time of this notice; otherwise it will be removed and stored at: A City Storage Facility."

116.   The Notice was dated February 10, 2009 and issued at 2:55 p.m.

117.   The Notice specified that: "Moving unlawfully stored items to another location on public property or right of way shall no [sic] constitute compliance with the ordinance."

118.   Since Reynolds is homeless, she has no access to private property to store her personal belongings.

119.   Since the ordinance and the notice both specify that "[m]oving the

22

unlawfully stored items to another location on public property shall not be considered to be removing the item from public property," Reynolds can not go to any public place in the City with her personal belongings and be in compliance with the ordinance. *See* § 8-321(d)(3).

120.   The broad definition of "store" means that if Reynolds merely "set" or "placed" a bag on the sidewalk next to her, it would be "unlawful storage" and a violation of this ordinance. *See* § 8-321(h)(1).

121.    Reynolds is faced with the choice of abandoning personal belongings that she owns or being in continuous violation of this ordinance.

122.   Reynolds is afraid of having her belongings taken by the City and/or being cited or arrested for violating the ordinance.

123.   Reynolds has discarded some of her personal property to comply with SPPD officers' instructions regarding the amount of property she is allowed to have without violating the ordinance.

124.   Reynolds has kidney problems and has difficulty making it through the night, when public bathrooms are closed, to wait to use the bathroom.  Reynolds does not drink water in the evenings because she is afraid that if she drinks too much water, she will have to use the bathroom in the middle of the night when there are no public bathrooms open.  Reynolds does not want to be arrested for public urination.

**William Shumate**

125.   Named Plaintiff William Shumate was born on May 5, 1948.  He is a

Vietnam veteran.  He has lived in St. Petersburg at various points dating back to the 1970s.  He has been homeless on and off for the past four years.

126.    Shumate generally rents a motel or other rental accommodations on a temporary basis when he can afford to pay.  When he is unable to obtain shelter, he sleeps on public streets and sidewalks in the downtown area of the City.

127.    Shumate is 60 years old and a diabetic.  He has difficulty making it through the night, when public bathrooms are closed, to wait to use the bathroom.

128.    On November 1, 2007, Shumate was sleeping on public sidewalks outside of City Hall when he needed to use the bathroom.  Around 1:00 a.m. he went to urinate near the side of the building, and was arrested by a SPPD officer for disorderly conduct, Fla. Stat. 877.03, for public urination (SPPD # 2007-066578).  There were no public bathrooms open, available and/or accessible for Shumate to use at that time.

129.    Shumate pled guilty to time served, one day in jail, and a fine of $300 for the disorderly conduct charge.

130.    Shumate began sleeping in a tent on city sidewalks in downtown St. Petersburg at the beginning of 2007 to protest the lack of available shelter space.

131.    On January 19, 2007, police officers from the SPPD slashed some of those tents and seized other property.

132.    After the tent slashing, Shumate returned to sleeping without a tent or other shelter on the public streets and sidewalks in downtown St. Petersburg, primarily in front of or near City Hall.

24

133.   After St. Petersburg City Code § 20-82 was enacted in January 2008, Shumate and other homeless individuals sleeping on public sidewalks near City Hall were told they can not be there until sunset and must leave before sunrise or face citation or arrest under the ordinance.   In the mornings, Shumate has had police officers from the SPPD kick his feet and the feet of other homeless individuals to wake them up and tell them to leave the area or be arrested.

134.   City officials have taken personal items belonging to Shumate from public places including city parks without notice.

135.   Shumate was not provided with instructions on how to retrieve his personal property that was confiscated by the City from city parks.  After speaking with people in the parks department, Shumate was given a phone number and told to call a city employee to make an appointment to go to the storage facility.  Although he made an appointment and tried several different times to claim his property, the city employee never showed up at the storage facility at the appointed time.  The storage facility where his property was being stored was locked and not open to the public.  As a result, Shumate was unable to retrieve his personal belongings, resulting in permanent deprivation of his personal property without notice or an opportunity to be heard.

136.   SPPD officers have stopped Shumate without reasonable suspicion of criminal activity and demanded that he produce identification when he has been in public areas including public parks.  During these stops, Shumate has been searched

25

by police officers from the SPPD without probable cause and without his consent.

### Allegations Regarding the City's Anti-Homeless Policies

137.   Defendant City has a policy, custom and/or practice of arresting, citing, harassing and otherwise interfering with homeless people for engaging in the ordinary and essential activities of daily life in the public places where Plaintiffs are forced to live. Plaintiffs and the putative class have been and continue to be arrested, cited, warned and/or ordered to comply under threat of arrest with, for example, prohibitions against trespass after warning on public property, City Code § 20-30 and Fla. Stat. § 810.08 and 810.09; outdoor storage, City Code § 8-321; sleeping in or on right-of-way, City Code § 20-74; sleeping, lying or reclining in rights-of-way during daylight hours, City Code § 20-82; and public urination/defecation, City Code § 20-123 and Fla. Stat. § 877.03, based solely on the fact that they sleep, sit, eat, carry personal items, take care of personal needs, and associate with friends and family in public.

**Ordinances Restricting Sleeping and Using Temporary Shelter in Right-of-Ways**

138.   In March 2007, the City Commission enacted and/or amended three separate ordinances that regulate sleeping and/or the use of temporary shelters on rights-of-way: § 20-74 (sleeping in or on right-of-way); § 20-75 (sleeping on right-of-way contiguous to residential property lines); § 20-76 (placement and use of temporary shelters).  A copy of these ordinances is attached as Exhibit B.

139.   In January 2008, the City Commission enacted § 20-82 (sleeping, lying or reclining on public rights-of-way).  A copy of this ordinance in its entirety is attached

as Exhibit C.

Section 20-74.  Sleeping In or On Right-of-Way

140.    Section 20-74 makes it unlawful "for any person to sleep in or on any part of the right-of-way, which shall include any public sidewalk."  § 20-74(a).

141.    A law enforcement officer is required to ask if the person violating § 20-74(a) has "legally existing available shelter space, either owned or available for use by the individual."  If the person has shelter space available "and agrees to travel, begins to travel immediately and continues to travel until reaching such shelter space, the person shall not be charged with a violation of this section."  § 20-74(b).

142.    If the law enforcement officer is aware that there is shelter space available at a shelter within the City or within 3 miles of the borders of the City, "the officer shall advise the person of the violation and, when necessary and when available, afford the person the opportunity to be transported to the shelter with any personal items requested to be removed by the individual, provided the shelter will accept the person." A person will not be charged with a violation of this section "if the person agrees to be transported to the shelter."  § 20-74(c).

143.    If the law enforcement officer is "not aware of available shelter space within the City of St. Petersburg or within three miles of the borders of the City of St. Petersburg, the person shall not be charged with a violation of this section." § 20-74(d).

144.    Violations of this section are punishable with up to 60 days in jail and/or a fine not exceeding $500.00 or any combination thereof.  § 20-74(f) & § 1-7(c).

<u>Section 20-75.  Sleeping on Right-of-Way Contiguous to Residential Lines</u>

145.    Section 20-75 prohibits sleeping on a right-of-way, including on any public sidewalk, which is contiguous to a residential property line.  § 20-75(a).

146.    If a person is found sleeping in a right-of-way where sleeping is prohibited, the law enforcement officer "shall request the person to move to an area where sleeping is not prohibited."  § 20-75(b).

147.    The person "shall not be charged with a violation of this section if the person voluntarily moves from and does not return, within 72 hours, to sleep on any part of any right-of-way, which shall include any public sidewalk, which is contiguous to a residential property line."  *Id.*

148.    Violations of this section are punishable with up to 60 days in jail and/or a fine not exceeding $500.00 or any combination thereof.  § 20-75(d) & § 1-7(c).

<u>Section 20-76.  Placement and Use of Temporary Shelters</u>

149.    Section 20-76 makes it unlawful for any person to "place, use, or occupy any tent, hut, lean-to, shack or other type of temporary shelter" on public property or on any part of the right-of-way.  § 20-76(a).

150.    Violations of this section are punishable with up to 60 days in jail and/or a fine not exceeding $500.00 or any combination thereof.  § 20-76(c) & § 1-7(c).

<u>Section 20-82.  Sleeping, lying or reclining on public rights-of-way</u>

151.    Section 20-82 prohibits sleeping, lying or reclining on any part of the right-of-way, which includes any public sidewalk, during daylight hours in a specified

"prohibited zone."  § 20-82(b).

152.    The "prohibited zone" is described as "any public sidewalk in the area from the northern right-of-way of Fifth Avenue North to the southern right-of-way of Fifth Avenue South and the western right-of-way of Sixteenth Street east to Tampa Bay and from the northern right-of-way of First Avenue North to the southern right-of-way of First Avenue South between Thirty First Street and Sixteenth Street."  *Id.*

153.    The ordinance does not define the term "recline."  See § 20-82.

154.    If a person is found to be in violation of this ordinance, a law enforcement officer "shall request the person to move to an area where sleeping, lying or reclining is not prohibited."  § 20-82(c)(1).

155.    A person shall not be charged with a violation if that person "voluntarily moves from and does not return to sleep, lie or recline on any part of any right-of-way in the Prohibited Zone during daylight hours."  *Id.*

156.    Violations of this section are punishable with up to 60 days in jail and/or a fine not exceeding $500.00 or any combination thereof.  § 20-82(e) & § 1-7(c).

Enforcement of Anti-Sleeping Ordinances

157.    Defendant has a policy, practice and/or custom of using the anti-sleeping ordinances (§§ 20-74, 20-75, 20-76 and 20-82) to intimidate and threaten Plaintiffs and putative class members into vacating public areas in the City under threat of arrest.

158.    On March 12, 2007, SPPD Police Chief Chuck Harmon issued a Memorandum regarding enforcement of these three ordinances entitled "Sleeping in

the public right-of-way."

159.    The March 12, 2007 Memo from SPPD Police Chief Chuck Harmon states that an officer should first make contact with an individual observed sleeping in the right-of-way, attempt to educate the subject about the violation and "afford the subject the opportunity to voluntarily comply with the ordinance by vacating the right-of-way." Harmon Memo (March 12, 2007) at 1.

160.    The Memo directs that if the person voluntarily vacates the area, "the officer shall document the violation in the form of a written police report as well as an entry into the CAD/RMS system." *Id.*

161.    The Memo also states that a person shall not be charged with a violation of the ordinance if shelter space is not available "within Pinellas County". The Memo states that even if there is no shelter space available "the person will be asked to comply with the ordinance by vacating the area." *Id.*

162.    On March 20, 2007, SPPD Police Chief Chuck Harmon issued a Memorandum regarding "Sleeping in the Public Right-of-Way and the Use of Temporary Shelters."

163.    The March 20, 2007 Memo from SPPD Police Chief Chuck Harmon stated that § 20-74 "should not be enforced until further notice."  It also directs officers to "attempt to educate individuals who may be in violation of this Section."  Harmon Memo (March 20, 2007) at 2.

164.    Plaintiff Catron and putative class members have been told by police

officers from the SPPD that they need to go to a shelter or vacate public sidewalks at night even when there is no shelter space available.

165.   Plaintiff Lile and putative class members have been told by police officers from the SPPD that they are not allowed to "recline" on the public sidewalks during the daytime, and are told they must either sit up straight on the sidewalk or be arrested.

166.   Plaintiffs Hargis, Lupperger, Shumate and putative class members who sleep on public sidewalks, such as in front of St. Vincent de Paul or near City Hall, are woken up in the mornings at or around sunrise by police officers from the SPPD who tell them they need to get up and leave the area or they will be arrested under § 20-82 of the City Code.

167.   Plaintiffs and putative class members fear they will be cited and/or arrested under § 20-82 of the City Code.

168.   Named Plaintiff Lupperger and putative class members have been cited and/or arrested under § 20-82 of the City Code.

**Ordinance Restricting Outdoor Storage of Property**

Section 8-321.

169.   Section 8-321, St. Petersburg City Code, as amended by Ordinance No. 873-G on January 24, 2008, purports to prohibit and make unlawful for any person to "store" any item of personal property on public property.  The ordinance provides, in relevant part: "It shall be unlawful for any person to store on any private or public property...(3) any junk, rubbish or garbage...(5) any item of personal property including

clothing or bedding." § 8-321(b).  A copy of the ordinance is attached as Exhibit D.

170.    The ordinance provides that "[t]he terms 'store' or 'stored' when referring to an item or items on public or private property shall be broadly interpreted to include any action to place, store, park, display, locate, or set upon an item or items." § 8-321 (h)(1).

171.    The term "public property" is defined to include "public rights-of-way." *Id.*

172.    The ordinance does not define the terms "junk, rubbish or garbage" as utilized in § 8-321(b).

173.    A person who has "unlawfully stored" such items on public property must remove the items within 36 hours after having been served with "written notice". § 8-321(d)(1).

174.    The notice "shall contain the following:

a.      A complete description of the items to be removed (such description may refer to an attached photograph),

b.      The location of the property,

c.      The section of the Code in violation,

d.      The location to which the items will be removed,

e.      The date and time by which the items must be removed from the private or public property, and

f.      The date by which the item(s) must be claimed from the location where they are being stored." § 8-321(g)(2).

175.    If the individual fails to remove any item within 36 hours after having been served with the notice, the City may remove the items.  § 8-321(d)(1).

176.    The ordinance specifies that "[m]oving the unlawfully stored items to another location on public property shall not be considered to be removing the item from public property."  § 8-321(3).

177.    The City "may dispose of the items after 30 days after removal from the public property."  § 8-321(d)(5).

178.    If the owner "wishes to retrieve the items, adequate proof of ownership and payment to the City of reasonable charges for storage and removal of the items are required."  *Id.*

179.    The ordinance states that the term "'reasonable charges' shall mean that the POD shall take into consideration the owner's ability to pay the charges."  § 8-321 (h).

180.    For notices related to removal of items on *private* property, the ordinance requires that the notice contain notification that a hearing may be held at the owner's request.  If requested, a hearing must be held before removal of any item.  See § 8-321(g)(3).

181.    The ordinance does not contain any similar provisions for a hearing for items stored on *public* property.  *See id.*

182.    The ordinance does not list any criminal penalties for a violation of § 8-321 nor does it cross-reference to another section of the City Code that deals with

general violations of the Code.

183.   Section 1-7, St. Petersburg City Code, states "[e]xcept as otherwise provided, a person convicted of a violation of this Code shall be punished by a fine not exceeding $500.00, imprisonment for a term not exceeding 60 days or by any combination thereof.  With respect to violations of this Code that are continuous with respect to time, each day the violation continues is a separate offense."  § 1-7(c).  A copy of this section is attached as Exhibit E.

Enforcement of Section 8-321

184.   Defendant City has a policy, custom and/or practice of conducting property sweeps and seizures on public sidewalks, in public parks, and in other public areas throughout the City, utilizing constitutionally inadequate procedures to temporarily and/or permanently deprive Plaintiffs and putative class members of their personal property.

185.   In public parks, the City has posted permanent signs that state that all unattended property may be removed without notice pursuant to § 8-321.

186.   Signs may be posted on public property stating that unattended items may be removed immediately without any additional notice only under certain enumerated conditions listed in the ordinance.  See § 8-321(d)(4).

187.   The signs in public parks do not comport with the conditions listed in § 8-321(d)(4) and therefore do not constitute adequate notice under the ordinance's provisions.

188.   Named Plaintiff Shumate and other putative class members have had personal property removed from city parks and other public areas without adequate notice and without notice of how to retrieve their personal belongings or opportunity for a hearing to contest the determination that the property was unlawfully stored.  This has resulted in temporary and/or permanent deprivation of Plaintiffs and putative class members' property.

189.   During "area-wide" sweeps near St. Vincent de Paul, a homeless service provider located in St. Petersburg, the City has posted signs entitled "Notice to the Owner and All Persons Interested in the Affected Property," at various times since 2008.  *See* 8-321(d)(4)(iii)(describing authority to conduct area-wide "clean-up[s]").

190.   One such notice, posted on December 31, 2008, stated "This property: All Property located within 25 feet of this Notice on Public Right of Way or Public Property is unlawfully upon public property known as: 15th Street North between 4th Ave N and 5th Ave N and must be removed within 36 hours from the date and time of this notice; otherwise it will be removed and stored at: 1675 5th Ave. N."

191.   After posting such notices, City officials have confiscated putative class members' personal belongings.

192.   Named Plaintiffs Reynolds and Hargis received individual notices entitled "Notice to the Owner and all Persons Interested in the Affected Property" in early 2009. A blank copy of the Notice being used by the SPPD is attached as Exhibit F.

193.   Other similar notices have been issued to putative class members in

public areas such as public parks.

194.    During these sweeps (both area-wide and those targeted at specific individuals), Plaintiffs and putative class members have received differing instructions from SPPD officers and City workers regarding the amount of personal property they may have at one time.  Plaintiffs and putative class members have been told they are only allowed to keep personal belongings they are able to carry at one time and/or are given specific instructions on the number of bags, blankets and other personal items they are allowed to have.

195.    As a result of these property sweeps, the City has confiscated personal belongings including bedding, blankets, clothes and other personal items from Plaintiffs and putative class members.

196.    Plaintiffs and putative class members fear they will be cited and/or arrested for violating this ordinance.

197.    Putative class members have been cited and/or arrested under § 8-321 for unlawful storage of personal property on public property.

198.    The City has failed to establish adequate procedural safeguards to enable Plaintiffs and putative class members to claim their property within the 30 day time limit established by § 8-321(5).  This has resulted in permanent deprivation of Plaintiffs and putative class members' personal property.

199.    Neither the ordinance nor the City has provided Plaintiffs or putative class members an opportunity for a hearing to contest the determination that their property

36

has been unlawfully "stored" on public property in violation of the ordinance.

200.    Plaintiffs and putative class members who have received notice pursuant to § 8-321 that they must remove their personal items from public property are prohibited from removing the items to another location on public property.  § 8-321(d)(3).

201.    Since the ordinance directs that the term "store" should be interpreted broadly and includes merely placing the items on public property, § 8-321 effectively becomes a blanket ban on homeless individuals' right to own property in the City of St. Petersburg.

**Laws Prohibiting Trespass**

Section 20-30.  Authorization to issue trespass warnings for public property.

202.    Section 20-30 of the City Code authorizes city employees, officials, or their designees, and police officers to issue trespass warnings for public property, including municipal parks.  A copy of this ordinance is attached as Exhibit G.

203.    The ordinance provides that "city employees or officials, or their designees, having control over a facility, building, or outdoor area, including municipal parks, are authorized to issue a trespass warning to any individual who violates any city ordinance, rule or regulation, or state law or lawful directive of a city employee or official."  § 20-30(a).

204.    The ordinance does not define the term "lawful directive" as used in § 20-30(a).

205.    When no other city employee or official is present, the ordinance authorizes a police officer "to issue a trespass warning to any individual who violates any city ordinance or state law which was committed while on or within a City-owned facility, building, or outdoor area, including municipal parks (but excluding rights-of-way)."  § 20-30(b).

206.    Prior to issuing a trespass warning, "the police officer must receive the approval of the officer's immediate supervisor for the issuance of the trespass warning." § 20-30(b).

207.    Trespass warnings issued pursuant to § 20-30 are permitted "for the specific property where the violation occurred."  § 20-30(a) & (b).

208.    An individual may be issued a trespass warning "for a period not to exceed one year" for the first violation of the ordinance.  § 20-30(c)(1).

209.    For subsequent violations, an individual may be issued a trespass warning "for a period not to exceed two years."  § 20-30(c)(2).

210.    Any individual who has previously been issued a trespass warning and is "found on or within any City-owned facility, building, or outdoor area, including municipal parks in violation of a trespass warning may be arrested for trespassing." § 20-30(e).

211.    A city employee or official, having control over the area where an individual has been trespassed, "may authorize an individual who has received a trespass warning to exercise his or her First Amendment rights or to conduct necessary

38

municipal business." § 20-30(f).

212.    The ordinance states that the "authorization must be in writing, specify the duration of the authorization and any conditions thereof, and shall not be unreasonably denied." § 20-30(f).

213.    The ordinance does not contain narrow, objective and definite standards to guide the city employee or official in determining whether to issue this authorization to exercise "First Amendment rights". *See* § 20-30(f).

214.    The ordinance grants total discretion to a city official to grant or deny a request to enter the property for exercising "First Amendment rights." *Id.*

215.    The ordinance does not set forth any time limits for the city official's review of the request to enter the property "to exercise his or her First Amendment rights" or for the grant or denial of the permit. *Id.*

216.    The ordinance does not provide a process for judicial review of an individual's request to exercise his or her protected First Amendment rights. *Id.*

217.    The ordinance explicitly states that its provisions "shall not be construed to limit the authority of any city employee or official to issue a trespass warning to any person for any lawful reason for any city property...when necessary or appropriate in the sole discretion of the city employee or official." § 20-30(g).

218.    The ordinance does not define "lawful reason" as used in § 20-30(g).

219.    The SPPD has issued an instructional order, effective November 2007, that describes procedures for the issuance of trespass warnings. Instructional Order,

Trespassing, V.5:32.  A copy of this instructional order is attached as Exhibit H.

220.   This instructional order is an official policy of the SPPD.  *See id.* at § I (Purpose).

221.   The instructional order includes a copy of the Trespass Warning Form used by the SPPD (Form SPPD-04-047).  *See* Ex. H.

222.   The instructional order specifies that "[a]lthough the Trespass Warning form requires identifying information about the person being trespassed, if this person agrees to leave the premises upon request by a person authorized to make the request, including a law enforcement officer, he/she cannot be compelled to disclose his/her name or produce identification."  Instructional Order, Trespassing, V.5:32 at § V(A).

223.   The instructional order authorizes a police officer to issue a Trespass Warning even if an individual left the premises "prior to police arrival but is located nearby."  *Id.* at § V(B).

224.   The order further specifies that "[t]he individual need not be physically present on the premises to receive the Trespass Warning."  *Id.*

Enforcement of Trespass Laws

225.   Defendant City has a policy, custom and/or practice of utilizing municipal ordinances and state trespass laws to arrest, cite, harass and otherwise prohibit Plaintiffs and the putative class from being in public spaces, particularly municipal parks, for the purpose of driving them from public areas.

226.   Defendant City has a policy, custom and/or practice of enforcing the

40

trespass laws to prohibit Plaintiffs and putative class members from being present on public sidewalks surrounding public parks, waiting for buses at bus shelters located on public sidewalks surrounding public parks, and using public bathrooms located inside public parks.

227.    Police officers from the SPPD have issued Trespass Warnings pursuant to § 20-30 to Named Plaintiffs Catron, Hargis, Lupperger and putative class members to prohibit them from returning to certain public parks.

228.    Named Plaintiffs Catron, Hargis, Lupperger and putative class members who have received such trespass warnings for public parks are subject to arrest if they go into those parks even when the parks are open to the general public.  § 20-30(e).

229.    Plaintiffs and putative class members who have received Trespass Warnings for public property such as public parks have been arrested, cited and/or are subject to arrest for trespass after warning under § 810.08 and/or 810.09.

230.    Plaintiffs and putative class members who have been issued Trespass Warnings for Williams Park have been told by SPPD officers that their Trespass Warnings apply "curb to curb" and that they are not allowed to be on the sidewalks surrounding the park, even if they are waiting for a city bus, or they will be arrested for trespass after warning.

231.    Plaintiffs and putative class members who have been issued Trespass Warnings for Williams Park have been told by SPPD officers that they are not allowed to use the bathrooms in the park or they will be arrested for trespass after warning.

232.    Local homeless advocates and other groups provide meals to hungry and homeless individuals in city parks such as Williams Park and Mirror Lake.  Plaintiffs and putative class members who have received trespass warnings for city parks either must risk arrest for trespass after warning to participate in these food sharing events or go without food they could otherwise obtain during these events.

233.    Named Plaintiff Hargis and putative class members who have been issued Trespass Warnings wish to engage in protected First Amendment activity in public parks but are prohibited from doing so without first applying for and receiving permission from the City.  *See* § 20-30(f).

234.    Named Plaintiff Hargis and putative class members who have been issued Trespass Warnings and wish to engage in protected First Amendment activity in public parks fear they will be cited and/or arrested for doing so.

**Laws Prohibiting Public Urination/Defecation**

Section 20-123.  Public urination/defecation prohibited.

235.    Section 20-123 of the City Code makes it unlawful for any person to "[u]rinate or defecate on any public place within the City...or within any portion of the City zoned as a business district or for industrial, or public uses unless such urinating or defecating is made into a receptacle that has been provided for that purpose, that stores or disposes of the wastes in a sanitary manner and that is enclosed from the view of the general public."  § 20-123(b)(1).  A copy of this ordinance is attached as Exhibit I.

42

236.   The ordinance also makes it unlawful to "[d]ump, unload or otherwise dispose of any urine or feces, in or on any public place within the City...or within any portion of the City zoned as a business district or for industrial or public uses other than in areas designated for such purposes."  § 20-123(b)(2).

237.   "Public place" is defined to include, but is not limited to, "any street or highway, alley, parking lot, driveway, sidewalk, boulevard, park, beach, wharf, pier, or other place open to the public view."  § 20-123(a).

238.   The ordinance's provisions do not apply to children under eleven (11) or to people who "lack the physical or mental ability to control their bodily functions." § 20-123(c).

239.   Named Plaintiff Lile and putative class members have been cited and/or arrested for public urination under § 20-123.

Fla. Stat. § 877.03.  Breach of the peace; disorderly conduct

240.    Section 877.03 of the Florida Statutes provides that "[w]hoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree." A copy of this statute is attached as Exhibit J.

241.   Named Plaintiffs Lupperger, Shumate and putative class members have been arrested under § 877.03 of the Florida Statutes for public urination/defecation.

43

<u>Enforcement of Public Urination/Defecation Laws</u>

242.   Defendant City has a policy, custom and/or practice of arresting or citing Plaintiffs and the putative class for life sustaining activities such as public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) at times and places where there are no public bathrooms open, available, and accessible to homeless people.

243.   Plaintiffs Lile, Lupperger and Shumate and putative class members have been arrested for public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) at times and places where there were no public bathrooms open, available, and accessible to them. Named Plaintiffs and putative class members fear they will be cited and/or arrested under these laws at times and places where there are no public bathrooms open, available, and accessible to them.

**Unlawful Police Tactics**

244.   Defendant City has a policy, custom and/or practice of: (a) stopping Plaintiffs and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave under threat of arrest public places where they are lawfully allowed to be in a concerted effort to intimidate homeless people into departing from the area.

44

245.   Named Plaintiffs Catron, Hargis, Lile, Lupperger, Shumate and putative class members have been stopped by SPPD officers without reasonable suspicion while they were in public areas such as public sidewalks, parks, or areas near homeless service providers and the police have demanded their identification under threat of arrest.

246.   Named Plaintiffs Catron, Hargis, Lupperger, Shumate and putative class members have been stopped by SPPD officers and had their personal belongings searched, without probable cause, in an effort to find a basis for arrest.

247.   SPPD officers order Plaintiffs and putative class members to leave public places where they are lawfully allowed to be in a concerted effort to intimidate homeless people into departing from the area.

**Municipal Liability**

248.   Defendant City's unlawful policies, practices, and customs are intentionally targeted at homeless individuals and are designed to intimidate them and drive them from the public streets, sidewalks, and public areas of the City, and to make it difficult to access the shelters, bathrooms, and service providers that provide them with essential services of daily life.

249.   At all relevant times, Defendant City and its officers, employees and agents have acted pursuant to the official policies, practices, and/or customs of the Defendant.

250.   These official policies, practices and/or customs have been promulgated,

approved, ratified and enforced by the persons and/or entities with the authority to set policy for the Defendant.

251.    The official policies, practices and/or customs of Defendant City are the direct and proximate cause of the constitutional violations alleged here, and it was reasonably foreseeable that the constitutional violations would result.

252.    At all relevant times, the officers, employees and agents of Defendant City were acting under the color of state law.

**Injunctive Relief**

253.    Defendants have engaged in a course of unlawful conduct aimed at harassing and intimidating homeless individuals and deterring them from exercising their rights to freedom of speech and expression under the First Amendment; rights to be free from unreasonable searches and seizures under the Fourth Amendment; right to be free from cruel and unusual punishment under the Eighth Amendment; right to travel under the Fourteenth Amendment and Article I, § 9 of the Florida Constitution; right to due process of law under the Fourteenth Amendment; and right to Equal Protection under the Fourteenth Amendment.

254.    Plaintiffs and putative class members were homeless at the time of the alleged violations, are homeless, and/or will remain homeless for the immediate future and are fearful that they will suffer the same repeated violations of their rights by Defendant's policies, practices or customs when they are on the public streets, sidewalks and parks of the City in the future.

255.    Plaintiffs and putative class members have suffered irreparable harm and, absent extraordinary relief from this Court, will continue to suffer irreparable harm through being subjected to unwarranted restrictions on their First, Fourth, Eighth, and Fourteenth Amendment rights of the U.S. Constitution and Article I, § 9 of the Florida Constitution.

256.    Absent injunctive relief, Plaintiffs and the putative class have no adequate remedy at law.

### COUNT 1
**Section 8-321 is facially unconstitutional in violation of the Due Process Clause 14th Amendment, U.S. Constitution 42 U.S.C. § 1983**

257.    Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 43; 57-58; 68-78; 106-123; 125-26; 134-35; 137; 169-201; 248-256.

258.    On its face, § 8-321 (prohibiting outdoor storage of property) is an unconstitutional infringement on Plaintiffs' and putative class members' affirmative right to due process of the law, in violation of the Fourteenth Amendment of the U.S. Constitution.

259.    Section 8-321 is void for vagueness as it does not convey sufficiently definite warning as to the proscribed conduct so that the ordinary citizen is put on notice as to what constitutes a violation of the ordinance.

260.    Section 8-321 fails to establish minimal guidelines to govern law enforcement and city officials, granting them unbridled discretion to distinguish between

unlawful and innocent behavior and allowing arbitrary and discriminatory enforcement.

261.   Section 8-321 deprives Plaintiffs and putative class members of constitutionally protected property interests without constitutionally adequate process.

262.   The ordinance violates procedural due process as it does not provide either a pre- or post-deprivation hearing process for Plaintiffs and putative class members to challenge the determination that their property is unlawfully "stored" in violation of the ordinance.

263.   The unconstitutional portions of § 8-321 are so inherent to its meaning that they cannot be severed from the ordinance.

264.   The entire ordinance should be stricken as unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

**COUNT 2**
**Section 8-321 is being applied unconstitutionally**
**in violation of the Due Process Clause**
**14th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

265.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 43; 57-58; 68-78; 106-123; 125-26; 134-35; 137; 169-201; 248-256.

266.   Section 8-321 is being applied in an unconstitutional manner to Plaintiffs and putative class members in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

267.   Defendant's widespread and persistent practice of using § 8-321 to seize

48

property belonging to Plaintiffs and putative class members has temporarily and/or permanently deprived them of their property and caused them injury.

268.   Plaintiffs and putative class members have been denied a pre- or post-deprivation hearing process to challenge the determination that their property is unlawfully "stored" in violation of the ordinance.

269.   The provisions of § 8-321 do not provide adequate notice to Plaintiffs and putative class members as to what constitutes a violation of the ordinance.

270.   Section 8-321 fails to establish minimal guidelines to govern law enforcement and city officials and has been applied in an arbitrary and discriminatory manner to Plaintiffs and putative class members.

271.   The City has not established procedural safeguards to protect against the arbitrary deprivation of Plaintiffs' and putative class members' personal property.

### COUNT 3
### Section 20-30 is facially unconstitutional in violation of the First Amendment
### 1st Amendment, U.S. Constitution
### 42 U.S.C. § 1983

272.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 53; 57-66; 90-91; 93-96; 100-102; 137; 202-234; 248-256.

273.   Section 20-30 (providing authorization to issue trespass warnings for public property) of the City Code is an unconstitutional infringement, on its face, of Plaintiffs' and putative class members' affirmative rights to freedom of speech and expression secured by the First Amendment of the U.S. Constitution.

49

274.   On its face, § 20-30 is a prior restraint on protected First Amendment activity in traditional public fora such as public parks by granting City officials the power to deny use of a forum in advance of actual expression.

275.   Named Plaintiff Hargis and putative class members who have received trespass warnings for public parks and wish to engage in protected First Amendment activity in these traditional public fora are prohibited from doing so without first applying and receiving permission from the City.

276.   Section 20-30 fails to contain narrow, objective and definite standards to guide the licensing authority and it lacks procedural safeguards to guard against unlawful infringement on protected First Amendment activity.

277.   Section 20-30 fails to establish substantive constraints on the City official who reviews requests to ensure against arbitrary and discriminatory limitations on protected First Amendment activity; provide for prompt judicial review; or place time constraints on issuance or denial of authorizations.

278.   Section 20-30 grants overly broad discretion to licensing officials and fails to allow for spontaneous speech activity in traditional public fora, such as municipal parks.

279.   On its face, § 20-30 is an overbroad restriction that sweeps into its ambit a substantial amount of constitutionally protected speech.

280.   The unconstitutional portions of § 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

50

281.   The entire ordinance should be stricken as facially unconstitutional in violation of the First Amendment of the U.S. Constitution.

**COUNT 4**
**Section 20-30 is being applied unconstitutionally**
**in violation of the First Amendment**
**1st Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

282.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 53; 57-66; 90-91; 93-96; 100-102; 137; 202-234; 248-256.

283.   Section 20-30 is being applied in an unconstitutional manner to Plaintiffs' and putative class members who have been issued Trespass Warnings for city parks and wish to engage in protected First Amendment activity in these traditional public fora.

284.   Section 20-30 is an unlawful prior restraint on Plaintiffs' and putative class members' protected First Amendment activity in traditional public fora such as public parks by granting City officials the power to deny use of a forum in advance of actual expression.

285.   Named Plaintiff Hargis and putative class members who have received trespass warnings for public parks and wish to engage in protected First Amendment activity in these traditional public fora are prohibited from doing so without first applying and receiving permission from the City.

286.   Named Plaintiff Hargis and putative class members who have been

issued Trespass Warnings for city parks are not able to engage in spontaneous expression in traditional public fora.

287.   As a direct and proximate cause of the enforcement of § 20-30 pursuant to Defendant's policies, practices and/or customs, Plaintiffs and putative class members who wish to engage in protected First Amendment activity are deprived of their First Amendment rights in quintessential public fora.   The ordinance and its application to Plaintiffs and putative class members has a chilling effect on constitutionally protected expression, causing irreparable harm.

**COUNT 5**
**Section 20-30 is facially unconstitutional**
**in violation of the Due Process Clause**
**14th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

288.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 53; 57-66; 90-91; 93-96; 100-102; 137; 202-234; 248-256.

289.    On its face, § 20-30 is an unconstitutional infringement of Plaintiffs' and putative class members' affirmative right to due process of law, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

290.   Section 20-30 is void for vagueness as it does not convey sufficiently definite warning as to the proscribed conduct so that the ordinary citizen understands the act/behavior that is unlawful.

291.   Section 20-30 fails to establish minimal guidelines for City officials and

police officers, granting them unbridled discretion to determine when to issue a Trespass Warning, for what behaviors, and for how long.  This allows for arbitrary and discriminatory enforcement.

292.   Section 20-30 fails to include procedural safeguards, such as a mechanism for judicial review of the issuance of trespass warnings, subjecting Plaintiffs and putative class members to arbitrary and discriminatory enforcement of an ordinance that allows City and law enforcement officials to ban them from public places, including public parks for long periods of time.

293.   The unconstitutional provisions of § 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

294.   The entire ordinance should be stricken as unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

**COUNT 6**
**Section 20-30 is being applied unconstitutionally**
**in violation of the Due Process Clause**
**14th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

295.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 53; 57-66; 90-91; 93-96; 100-102; 137; 202-234; 248-256.

296.    Section 20-30 is being applied in an unconstitutional manner to Plaintiffs and putative class members in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

53

297.    As a direct and proximate cause of the enforcement of § 20-30 pursuant to Defendant's policies, practices and/or customs, Plaintiffs and putative class members have been deprived of their due process rights and have suffered irreparable harm.

### COUNT 7
**Section 20-82 is facially constitutional in violation of the Due Process Clause 14th Amendment, U.S. Constitution
42 U.S.C. § 1983**

298.    Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 43; 57-58; 67; 80-81; 86-88; 90-92; 103-04; 125-26;133; 137; 139; 151-57; 165-68; 248-56.

299.    On its face, § 20-82 (prohibiting sleeping, lying or reclining on the rights-of-way during daylight hours) is an unconstitutional infringement of Plaintiffs' and putative class members' affirmative right to due process of law, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

300.    Section 20-82 is void for vagueness as it does not convey sufficiently definite warning as to the proscribed conduct so that the ordinary citizen understands the act/behavior that is unlawful.  The ordinance fails to define key terms and phrases such as the term "recline".

301.    Section 20-82 fails to establish minimal guidelines for City officials and police officers, granting them unbridled discretion to enforce the ordinance in an arbitrary and discriminatory manner.

302.    The unconstitutional provisions of § 20-82 are so inherent to its meaning

that they cannot be severed from the ordinance.

303.   The entire ordinance should be stricken as unconstitutional in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

### COUNT 8
### Section 20-82 is being applied in an unconstitutional manner
### in violation of the Due Process Clause
### 42 U.S.C. § 1983

304.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 43; 57-58; 67; 80-81; 86-88; 90-92; 103-04; 125-26;133; 137; 139; 151-57; 165-68; 248-56.

305.    Section 20-82 is being applied in an unconstitutional manner to Plaintiffs and putative class members in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

306.   As a direct and proximate cause of the enforcement of § 20-82 pursuant to Defendant's policies, practices and/or customs, Plaintiffs and putative class members have been deprived of their due process rights and have suffered irreparable harm.

### COUNT 9
### Violation of the right to be free from cruel and unusual punishment
### 8th Amendment, U.S. Constitution
### 42 U.S.C. § 1983

307.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in Paragraphs 1 through 45; 56; 80-85; 90-91; 97-102; 106-108; 124-29; 137-68; 235-243; 248-56.

308.    Forces beyond Plaintiffs' control, such as lack of affordable housing or other shelter, disability, unemployment, have compelled Plaintiffs to live, sleep and take care of basic human needs in public.

309.    Activities such as sleeping and using the bathroom are essential life-sustaining functions for everyone.  When performed inside, they are unquestionably considered legal. However, homeless persons are being punished for the very same life-sustaining actions.  Without access to shelter or public restrooms, homeless persons have no choice but to conduct these activities in public in order to survive.

310.    Defendants' policy, practice and/or custom of harassing, arresting, and incarcerating involuntarily homeless persons for life-sustaining activities such as public urination/defecation at times and places when there are no public bathrooms open, available and accessible to homeless individuals constitute punishment of Plaintiffs and putative class members based on their status as homeless persons and, as such, is cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution.

## COUNT 10
**Violation of the right to be free from unreasonable search and seizure**
**4th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

311.    Plaintiffs reallege and incorporate by reference as though fully set forth here, the allegations contained in Paragraphs 1 through 45; 54-58; 67; 79; 80-81; 86; 89-92; 105; 125-26; 133; 136-68; 244-256.

312.    Defendant City's policy, custom and/or practice of: (a) stopping Plaintiffs

and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave public places where they are lawfully allowed to be under threat of arrest in a concerted effort to intimidate homeless people from departing the area violate the Fourth Amendment rights of Plaintiffs and the putative class to be free from unreasonable searches and seizures, as guaranteed by the U.S. Constitution.

**COUNT 11**
**Violation of the right to Equal Protection**
**14th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

313.    Plaintiffs reallege and incorporate by reference as though fully set forth here, each and every allegation contained in Paragraphs 1 through 256.

314.    Defendant City's policies, practices and/or customs described above are intentionally targeted at homeless individuals to intimidate and drive them from the public streets, sidewalks and public areas of St. Petersburg and to make it difficult to access the shelters, bathrooms, and service providers that provide them with essential services of daily life.

315.    Defendant City's unlawful policies, practices and/or customs described above discriminate against Plaintiffs and putative class members based on their status as homeless individuals and are not rationally related to a legitimate governmental interest.

57

316.    Defendant City's unlawful policies, practices and/or customs described above deny Plaintiffs and putative class members Equal Protection under the law, in violation of the Fourteenth Amendment of the U.S. Constitution.

**COUNT 12**
**Violation of the right to travel**
**14th Amendment, U.S. Constitution;**
**42 U.S.C. § 1983;**

317.    Plaintiffs reallege and incorporate by reference as though fully set forth here, each and every allegation contained in Paragraphs 1 through 256.

318.    Defendant City's policies, practices and/or customs described above burden named Plaintiffs' and putative class members' fundamental right to travel. Specifically, the City's enforcement of laws that prevent homeless individuals who have no place to go from sleeping, lying down, using public bathrooms, eating, keeping personal property, being in public parks and on public sidewalks and performing other life-sustaining activities burdens their fundamental right to travel.

319.    Defendant City's policies, practices and/or customs described above have the effect of preventing homeless people from coming into the City, expelling those already present, infringing on the right to travel locally through public spaces and roadways, and of significantly burdening their freedom of movement within the City and the state.

320.    Defendant City's policies, practices and/or customs described above fail strict scrutiny review as they are not narrowly tailored to serve a compelling state interest.

58

321.   Alternatively, Defendant City's policies, practices and/or customs described above fail even rational basis review as they are not rationally related to a legitimate governmental purpose.

322.   Defendant City's policies, practices and/or customs described above constitute a violation of Plaintiffs' and putative class members' fundamental right to travel, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.

### COUNT 13
### Violation of the right to intrastate travel
### Article I Section 9, Fla. Constitution;
### 28 U.S.C. § 1367(a)

323.   Plaintiffs reallege and incorporate by reference as though fully set forth here, each and every allegation contained in Paragraphs 1 through 256.

324.   The right to intrastate travel is a fundamental right under the Florida Constitution.

325.   Defendant City's policies, practices and/or customs described above burden Plaintiffs' and putative class members' fundamental right to intrastate travel, as guaranteed by the Florida Constitution.

326.   Defendant City's policies, practices and/or customs described above fail strict scrutiny review as they are not narrowly tailored to serve a compelling governmental interest in violation of the Florida Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.   A preliminary and permanent injunction, enjoining Defendant City from

59

interfering with Plaintiffs' and putative class members' constitutionally protected rights under the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution and Article I § 9 of the Florida Constitution.  Specifically, to enjoin Defendant City from:

    a.    Issuing trespass warnings for public property, including public parks, pursuant to City Code § 20-30;

    b.    Arresting individuals for trespass after warning under Fla. Stat. § 810.08 and 810.09, pursuant to trespass warnings previously issued for public property under City Code § 20-30;

    c.    Arresting homeless individuals for public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) when there are no public bathrooms open, available, and accessible to homeless people;

    d.    Enforcing provisions of City Code § 8-321 related to outdoor storage on public property;

    e.    Enforcing City Code § 20-82;

    f.    Stopping homeless individuals and demanding production of identification without reasonable suspicion of criminal activity while they are simply standing or walking on public streets and sidewalks;

    g.    Searching possessions of homeless individuals without probable cause;

h.      Ordering homeless individuals under threat of arrest to move along from public places where they are lawfully allowed to be;

2.      For a declaration that § 8-321, is facially unconstitutional under the Fourteenth Amendment of the U.S. Constitution;

3.      For a declaration that § 8-321 is being applied unconstitutionally to Plaintiffs and putative class members under the Fourteenth Amendment of the U.S. Constitution;

4.      For a declaration that § 20-30 of the City Code is facially unconstitutional in violation of the First and Fourteenth Amendments of the U.S. Constitution;

5.      For a declaration that § 20-30 of the City Code is being applied unconstitutionally to Plaintiffs and putative class members in violation of the First and Fourteenth Amendments of the U.S. Constitution;

6.      For a declaration that § 20-82 of the City Code is facially unconstitutional in violation of the Fourteenth Amendment of the U.S. Constitution;

7.      For a declaration that § 20-82 of the City Code is being applied unconstitutionally to Plaintiffs and putative class members in violation of the Fourteenth Amendments of the U.S. Constitution;

8.      For a declaration that arresting Plaintiffs and putative class members for engaging in life-sustaining activities such as public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) when there are no public bathrooms open, available, and accessible to

61

homeless people is cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution;

9.    For a declaration that Defendant City's past, present, and threatened future actions violate Plaintiffs and putative class members' rights to freedom of speech and expression under the First Amendment; rights to be free from unreasonable searches and seizures under the Fourth Amendment; right to be free from cruel and unusual punishment under the Eighth Amendment; right to travel under the Fourteenth Amendment and Article I, § 9 of the Florida Constitution; right to due process of law under the Fourteenth Amendment; and right to Equal Protection under the Fourteenth Amendment;

10.    For attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

11.    For such other relief as this Court deems just and proper.


Respectfully Submitted,


   /s/ Kirsten Clanton
Kirsten Clanton, Fla. Bar No. 17179
kirsten.clanton@southernlegal.org
Neil Chonin, Fla. Bar No. 13428
neil.chonin@southernlegal.org
Alice K. Nelson, Fla. Bar No. 211771
alice.nelson@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

Peter P. Sleasman, Fla. Bar No. 367931
psleasman@filsinc.org
Florida Institutional Legal Services, Inc.
12921 SW 1st Road, Ste. 107, #346
Newberry, FL 32669
(352) 375-2494
(352) 331-5202 (fax)

Catherine A. Bendor, D.C. Bar No. 442437
*Special Admission to Practice Applicant*
cbendor@nlchp.org
Tulin Ozdeger, D.C. Bar No. 476548
*Special Admission to Practice Applicant*
tozdeger@nlchp.org
National Law Center on Homelessness & Poverty
1411 K St., NW, Suite 1400
Washington, D.C. 20005
(202) 638-2535
(202) 628-2737 (fax)