UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTHONY CATRON, MICHAEL LILE,
JO ANNE REYNOLDS, WILLIAM
SHUMATE, and RAYMOND YOUNG
on behalf of themselves and all others
similarly situated,

        Case No: 8:09-CV-923-SDM-EAJ

      Plaintiffs,

v.

CITY OF ST. PETERSBURG,

      Defendant.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF/CLASS ACTION

### PRELIMINARY STATEMENT

1.     This is a class action brought on behalf of homeless residents of the City of St. Petersburg (CITY) for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 for past and ongoing injury to Plaintiffs' rights guaranteed by the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution, and Article I, § 2 of the Florida Constitution.

2.     Homeless residents are those individuals who at any time since the filing of the complaint in this action (Doc. 1) have lacked a fixed, regular, and adequate nighttime residence and/or lack the financial resources or have other problems that prevent them from being able to provide for their own shelter and

1

other essentials. This includes individuals who are sharing the housing of other persons due to loss of housing, economic hardship, or similar reasons; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings; or are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings.

### JURISDICTION

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) & (4) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202.

4.      This Court has supplemental jurisdiction over Plaintiffs' state constitutional claims pursuant to 28 U.S.C. § 1367(a).

### VENUE

5.      Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and M.D. Loc. R. 1.02.  Plaintiffs reside, Defendant is located, and all of the acts and omissions complained of herein occurred and will continue to occur in the Tampa Division of the Middle District of Florida.

**NAMED PLAINTIFFS[1]**

6.     Plaintiff ANTHONY CATRON is a homeless resident of the CITY. CATRON is 23 years old.  He aged out of foster care when he was 18 years old and has been homeless on and off since that time.  CATRON generally stays with friends or finds other shelter on a temporary basis.  When he is unable to obtain shelter, he sleeps on public streets and sidewalks in downtown St. Petersburg.

7.     Plaintiff MICHAEL LILE is a homeless resident of the CITY.  LILE is 57 years old.   He is a disabled United States Army veteran.   He moved to St. Petersburg in 2002 and has been homeless on and off since the beginning of 2008. LILE sometimes stays with friends or rents a temporary place to stay when he is able to afford one.  When he is unable to obtain shelter, LILE generally sleeps on public streets and sidewalks in downtown St. Petersburg.

8.     Plaintiff JO ANNE REYNOLDS is a homeless resident of the CITY. REYNOLDS was born on June 10, 1957.  She is a person with a disability and uses a wheelchair to get around.  REYNOLDS receives Social Security Disability income but the monthly payments are not enough for her to pay for housing and other basic living expenses.    REYNOLDS stays in a motel or other temporary rental accommodations when she can afford to pay.  When she doesn't have enough

---

[1] In the initial Complaint (Doc. 1) Charles Hargis and Ferdinand Lupperger were Named Plaintiffs.  Lupperger is no longer able to continue as a Plaintiff in this case and has authorized his attorneys to voluntarily dismiss his claims.  Undersigned Counsel filed a motion to withdraw from representing Hargis.  This motion is pending.  (Doc. 32.)  Neither of these individuals remain as Named Plaintiffs in this Amended Complaint.

3

money to afford a motel room, she stays on public streets and sidewalks in St. Petersburg.

9.      Plaintiff WILLIAM SHUMATE is a homeless resident of the CITY.  He is 61 years old.  He is a Vietnam veteran.  He has lived in St. Petersburg at various points dating back to the 1970s.  He has been homeless on and off for the past four years.  SHUMATE generally rents a motel or other rental accommodations on a temporary basis when he has been able to obtain financial assistance.  When he is unable to obtain shelter, he sleeps on public streets and sidewalks in the downtown area of the CITY.

10.     Plaintiff RAYMOND YOUNG is a homeless resident of the CITY.  He is 69 years old.  YOUNG is retired and is a person with a disability who receives Social Security Disability benefits.  YOUNG became homeless approximately two years ago due to the inability to obtain affordable housing.  When he is unable to obtain shelter, he sleeps on public streets and sidewalks in the downtown area of the CITY.

## DEFENDANT

11.     Defendant CITY is a municipal entity organized under the laws of the State of Florida, with the capacity to sue and be sued.

12.     The CITY Commission sets final policy on the creation and adoption of CITY ordinances.

13.     Defendant CITY is the legal entity responsible for the police department known as the City of St. Petersburg Police Department (SPPD).  This

4

police department has the traditional authority of police forces to enforce Florida statutes and CITY ordinances.

14.    The CITY is sued for injunctive and declaratory relief on the basis of acts of officers, agents and employees of SPPD and the CITY, which were taken pursuant to official policy, practice and/or custom.

15.    At all times relevant herein, the officers, agents, and employees of SPPD and the CITY were acting under color of state law.

## CLASS ACTION ALLEGATIONS

16.    Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the Named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

17.    The class is defined as all persons who (a) are, will be, or have been homeless as defined in paragraph two of this Amended Complaint; (b) reside within the CITY and (c) are, or would be, subject to one or more of the CITY's policies, practices or customs challenged by this action.

18.    Numerosity: The Plaintiff class is so numerous that joinder of all its members is impracticable.  According to the 2009 Annual Homeless Count and Survey conducted by the Pinellas County Coalition for the Homeless[2] (PCCH 2009 Survey), there are an estimated 6,235 homeless individuals (both sheltered and unsheltered) who live in Pinellas County.  Of the 2,232 unsheltered individuals,

---

[2]This Survey reports the results of the annual Point-in-Time Count which is conducted during the last week of each January to provide statistically reliable estimates of homeless persons in sheltered and unsheltered conditions in Pinellas County.  A copy of the PCCH 2009 Survey is attached as Exhibit A.

approximately 45.6% live in the CITY.[3]  Many of the homeless individuals who live in

the CITY have been or will be subjected to the CITY's policies, practices or customs

challenged by this lawsuit.  Therefore, joinder of all parties is impracticable.

19.    <u>Commonality</u>: There are questions of law or fact that are common to all

Named Plaintiffs, as well as to putative class members, including:

a.    Whether § 8-321 of the City Code is unconstitutional on its face

and as applied to Plaintiffs and putative class members in violation of the Due

Process Clause of the Fourteenth Amendment of the U.S. Constitution;

b.    Whether § 20-30 of the City Code is unconstitutional on its face

and as applied to Plaintiffs and putative class members in violation of the Due

Process Clause of the Fourteenth Amendment and of the First Amendment of the

U.S. Constitution;

c.    Whether Defendant's policy, practice and/or custom of

harassing, arresting, and incarcering involuntarily homeless people for life-

sustaining activities such as public urination/defecation at times and places where

there are no public bathrooms open and accessible to homeless individuals

constitute punishment of Plaintiffs and putative class members based on their status

as homeless persons and, as such, is cruel and unusual punishment in violation of

the Eighth Amendment of the U.S. Constitution;

d.    Whether Defendant's policy, custom and/or practice of: (a)

---

[3]The PCCH 2009 Survey does not provide an estimate of the total number of homeless individuals (sheltered and unsheltered) who live in the CITY.  *See* Ex. A.

stopping Plaintiffs and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave under threat of arrest public places  where they are lawfully allowed to be in a concerted effort to intimidate homeless people to depart the area violate the Fourth Amendment rights of Plaintiffs and the putative class members to be free from unreasonable searches and seizures, as guaranteed by the U.S. Constitution;

e.    Whether Defendant's policies, practices and/or customs violate Plaintiffs' and putative class members' right to travel in violation of the Article I, § 2 of the Florida Constitution.

The questions of law and fact common to all members of the putative class predominate over any question affecting only individual members.

20.    <u>Typicality</u>: The claims of the Named Plaintiffs are typical of the claims of the putative class as a whole in that the Named Plaintiffs and putative class members have been arrested and/or harassed and/or expect to be arrested and/or harassed in the future by Defendant CITY for engaging in ordinary and essential activities of daily living.  Further, the named plaintiffs and putative class members' claims arise out of their involuntary status as homeless individuals.

21.    <u>Adequate representation</u>: The Named Plaintiffs will fairly represent and adequately protect the interests of the members of the putative class as a whole.

The Named Plaintiffs do not know of any conflict of interest among putative class members. By filing this action, the Named Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated. The relief sought by the Named Plaintiffs will inure to the benefit of members of the class generally. The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, constitutional law, practice and procedure in the federal courts and the prosecution and management of class action litigation.

22.     Defendant's policies, practices or customs affect all members of the putative class in the same way, thereby making injunctive and declaratory relief appropriate with respect to the class as a whole under Fed. R. Civ. P. 23(b)(2). A class action is superior to individual lawsuits for resolving this controversy.

## HOMELESSNESS IN ST. PETERSBURG

23.     According to the PCCH 2009 Survey, there are 6235 homeless individuals living in Pinellas County. This represents a 20% increase in the total number of homeless individuals from 2007. Ex. A.

24.     Of these individuals surveyed, 2,232 are living in unsheltered situations in Pinellas County, an increase of 82.7% from 2007. *Id.*

25.     Of the 2232 unsheltered homeless individuals living in Pinellas County, 45.6% reside primarily in the CITY. *Id.*

26.     Of the sheltered and unsheltered individuals surveyed in Pinellas

8

County, 45.8% reported last having a permanent address in the CITY.  *Id.*

27.     The total homeless population in Pinellas County was 34% female and 68% male.  *Id.*

28.     Veterans make up approximately 18% of the homeless individuals in Pinellas County.  *Id.*

29.     While the majority of homeless individuals surveyed were between 18-64 (approximately 65%), there was a significant increase in youth homelessness reflected by the PCCH 2009 Survey with those individuals between 1-17 years of age making up 31.5% of the total homeless population in the County.  *Id.*

30.     Of the individuals surveyed, 42.8% reported having a disability of long duration.  *Id.*

31.     Approximately 86.3% of the individuals surveyed in 2009 reported lack of income/lost job and other financial reasons as their primary reason for homelessness.  *Id.*

32.     According to the CITY's Annual Action Plan for 2008/09, there are insufficient emergency shelter beds, transitional housing and permanent housing available for homeless individuals in the CITY.[4]

33.     In its 2008 Continuum of Care Application to the U.S. Department of Housing and Urban Development (HUD)[5], the Pinellas County Coalition for the

---

[4]The 2008/09 Annual Action Plan is available on the CITY website at http://www.stpete.org/housing/docs/Final_Consolidated_Annual_Action_Plan_for_FY_08_09.pdf.
[5]The 2008 application is available on the PCCH website at http://www.pinellashomeless.org/information/research-documents.html.

Homeless (PCCH) stated that even though the number of beds for unsheltered individuals had increased, "we have seen no decrease in the number of unsheltered individuals; the numbers continue to increase as we have lost low income housing and have experienced job losses higher than the national average." PCCH, *2008 Continuum of Care Application* at 50.

34.     Pinellas County Consumer and Justice Services compiled a recent report entitled *Chronic Minor Offenders in Pinellas County Jail*.[6]   *Pinellas Hope: Reducing Street Homelessness* at 13.

35.     The study analyzed jail data from 2005 through April 2008 and found that 3,789 unique individuals with a homeless-related address were arrested.[7]  *Id.*

36.     An analysis of the jail data for local ordinance violations revealed 3,844 unique arrests for 1,997 unique individuals.  *Id.*

37.     The SPPD is the top law enforcement agency in Pinellas County for local ordinance violations, accounting for 55% of the total arrests for these violations.

38.     The 3,844 local ordinance arrests accounted for 12,051 jail days and a total estimated cost of $1,108,692.  *Id.* at 14.

39.     According to the study, 152 people (8% of the total number of individuals represented by the arrest data) accounted for approximately 7,198 of the ordinance jail days (60% of the total number of ordinance jail days).  *Id.*   This

---

[6]The results of this study were discussed in a report titled *Pinellas Hope: Reducing Street Homelessness*, available on the PCCH website at http://www.pinellashomeless.org/information/research-documents.html.
[7]Those individuals who reported an address of a homeless shelter, friend or relative, or who refused to provide an address were not counted in this analysis.

averages to about 7 arrests per person, with these 152 individuals accounting for $662,216 or 60% of the total cost. *Id.*

40.    This report demonstrated there is an average jail stay of 3.5 days for local ordinance arrests, making it difficult for homeless individuals to connect to social services and break the cycle of homelessness. *Id.*

## MUNICIPAL LIABILITY

41.    Defendant CITY has a policy, custom and/or practice of arresting, citing, harassing and otherwise interfering with homeless people for engaging in the ordinary and essential activities of daily life in the public places where Plaintiffs are forced to live.   Plaintiffs and putative class members have been and continue to be arrested, cited, warned and/or ordered to comply under threat of arrest with, for example, prohibitions against trespass after warning on public property, City Code § 20-30 and Fla. Stat. § 810.08 and 810.09; storage of personal property in public, City Code § 8-321; and public urination/defecation, City Code § 20-123 and Fla. Stat. § 877.03, based solely on the fact that they sleep, sit, eat, carry personal items, take care of personal needs, and associate with friends and family in public.

## COUNT 1

**Section 8-321 (Ordinance Restricting Outdoor Storage of Property) is void for vagueness in violation of the Procedural Due Process Clause Of The 14th Amendment, U.S. Constitution 42 U.S.C. § 1983**

42.    Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue);

11

paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY; and paragraph 41 (regarding Municipal Liability).

<u>The Ordinance</u>:

43.     Section 8-321, St. Petersburg City Code, as amended by Ordinance No. 873-G on January 24, 2008, prohibits and makes unlawful for any person to "store" any item of personal property on public property.  The ordinance provides, in relevant part: "It shall be unlawful for any person to store on any private or public property...(3) any junk, rubbish or garbage...(5) any item of personal property including clothing or bedding."  St. Petersburg City Code § 8-321(b).

44.     Section 8-321 is an official policy of the CITY.  A copy of the ordinance is attached as Exhibit B.

45.     The ordinance provides that "[t]he terms 'store' or 'stored' when referring to an item or items on public or private property shall be broadly interpreted to include any action to place, store, park, display, locate, or set upon an item or items." § 8-321 (h)(1).

46.     The term "public property" is defined to "include public rights-of-way," without further definition. *Id.*

47.     The term "public rights-of-way" is not defined in the ordinance.  Nor is it defined in the general definition section of the St. Petersburg Code.  St. Petersburg City Code (Code) § 1-2.

48.     The ordinance does not define the terms "junk, rubbish or garbage" as

utilized in § 8-321(b).

49.     The ordinance does not provide any definitions of "place, store, park, display, locate, or set upon."

50.     The ordinance does not contain any provisions regarding the number of items a person can have in his or her possession while on "public property."

51.     The ordinance does not define the term "unattended" as used in § 8-321(d)(4) nor does it contain any provisions governing whether an individual may attend to or watch over another individual's property for any period of time.

52.     "Abandoned" property is regulated and removed pursuant to Chapter 705.101, *et seq.*, Florida Statutes. § 8-321(j).

53.     "Abandoned" property is specifically defined by Florida Statutes as "all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner."   Fla. Stat. § 705.101(3).

54.     "Abandoned" and "unattended" property are not synonymous terms for purposes of the ordinance.  These are two distinct categories of property addressed by different portions of the ordinance.  *Compare* § 8-321(j) (governing "abandoned" property) with § 8-321(d)(4) (governing "unattended" property).

55.     A person who has "unlawfully stored" items on "public property" must remove the items within 36 hours after having been served with "written notice".  § 8-

321(d)(1).

56.     If the individual fails to remove any item within 36 hours after having been served with the notice, the CITY may remove the items.  § 8-321(d)(1).

57.     The ordinance specifies that "[m]oving the unlawfully stored items to another location on public property shall not be considered to be removing the item from public property."  § 8-321(3).

58.     The ordinance does not list any criminal penalties for a violation of § 8-321 nor does it cross-reference to another section of the City Code that deals with general violations of the Code.   However, Section 1-7, St. Petersburg City Code, states "[e]xcept as otherwise provided, a person convicted of a violation of this Code shall be punished by a fine not exceeding $500.00, imprisonment for a term not exceeding 60 days or by any combination thereof.  With respect to violations of this Code that are continuous with respect to time, each day the violation continues is a separate offense."  § 1-7(c).  A copy of this section is attached as Exhibit C.

Specific Allegations as to Plaintiffs' Facts:

REYNOLDS

59.     On February 10, 2009, REYNOLDS was issued a written notice entitled "Notice to The Owner and All Persons Interested in the Affected Property" (Reynolds's Notice) (SPPD # 2009-9274).  The Notice was issued pursuant to § 8-321 of the St. Petersburg City Code and is attached as Exhibit D.

60.     At the time, REYNOLDS was sleeping on a public sideway in the CITY.

14

Since she did not have access to shelter or a place to store her belongings, REYNOLDS had everything that she could fit into one bag that hung on her wheelchair.  REYNOLDS' boyfriend had several bags and he also carried blankets for REYNOLDS and other personal belongings she could not carry in her wheelchair.

61.    REYNOLDS was sitting in her wheelchair with her personal belongings and her boyfriend's belongings on a park bench beside her when she was issued her notice, which was hand delivered to her by a SPPD officer.

62.    REYNOLDS' Notice stated that: "This property: 2 duffel bag (1 grn 1 camo), 1 blue backpack is unlawfully stored upon public property known as Williams Park must be removed within thirty-six (36) hours from the date and time of this notice; otherwise it will be removed and stored at: A City Storage Facility." Ex. D.

63.    REYNOLDS was told by the officer that having more than two bags is considered storage on public property.

64.    Due to the broad definition of "store" and the insufficient definition of "public property" and "rights-of-way," REYNOLDS did not have notice if "setting" or "placing" a bag on a park bench next to her would be "unlawful storage" in violation of this ordinance.  *See* § 8-321(h).

SHUMATE

65.    SHUMATE had personal property confiscated by the CITY while he was in a CITY park on three different occasions.  He asked other individuals to watch his belongings while he left the park temporarily to use the bathroom or go to the store.

15

When he returned to the park, his belongings had been taken pursuant to the CITY's policy, practice or custom of removing "unattended" items from CITY parks without notice.  SHUMATE and other homeless individuals have been told by CITY officials that people are not allowed to watch other individuals' belongings.  If the owner is not present, then the property is considered to be "unattended" for purposes of enforcement of the law pursuant to the CITY's policy, practice or custom.  YOUNG

66.    On March 11, 2009, YOUNG was on a park bench on the south side of Central Avenue with his personal belongings.  He had a cart with 2 suitcases, a few bags, clothes, hygiene products and other personal belongings.  He had just received his food stamps and had gone grocery shopping so he also had a bag of groceries.

67.    A police officer came up to the park bench where YOUNG was sitting and told him he had "too much stuff."  He said YOUNG was only allowed to have two bags, one backpack and one blanket.

68.    The officer arrested YOUNG for outdoor storage of personal property pursuant to Section 8-321 and also on an open container charge. YOUNG did not receive a written notice that he was in violation of Section 8-321 prior to being arrested although the police officer stated in the report that he had been previously warned.  A copy of the arrest report (SPPD # 2009-016423) is attached as Exhibit E.

69.    YOUNG'S property was also seized at the time of his arrest.  While the CITY did not give YOUNG information about where his property was being stored or how to retrieve his personal belongings, YOUNG on his own initiative was able to find

16

out how to retrieve his belongings and was able to claim his property.

70.   Since his arrest, YOUNG has been warned by other police officers that he needs to "downsize", and he has discarded personal belongings to comply with these orders.  For example, in June of 2009, he was told by a St. Petersburg police officer that he had "too much stuff" and was allowed to have only 1 suitcase and 2 blankets.  If he did not comply with the officer's directives, he was told his belongings would be seized.

71.   During these sweeps (both area-wide and those targeted at specific individuals), Plaintiffs and putative class members have received differing instructions from SPPD officers and CITY workers regarding the amount of personal property they may have at one time.  Plaintiffs and putative class members have been told they are only allowed to keep personal belongings they are able to carry at one time and/or are given specific instructions on the number of bags, blankets and other personal items they are allowed to have.

Legal Claim:

72.   Section 8-321 is void for vagueness as it does not convey sufficiently definite warning as to the proscribed conduct so that the ordinary citizen is put on notice as to what constitutes a violation of the ordinance.

73.   Section 8-321 is void for vagueness due to its failure to give adequate warning of the boundary between constitutionally permissible and impermissible applications of the law.  The vagueness of Section 8-321 is apparent in that it has

been used to arrest YOUNG to punish him for the purported "crime" of owning personal property; conduct for which he cannot constitutionally be punished.

74.     The ordinance is vague as it does not contain an adequate definition of "public property" or a  definition of   " rights-of-way. "  This lack of definition leaves uncertain on which public property one is not permitted to "store" property and gives unfettered discretion to CITY employees and/or police officers to seize personal property.

75.     Section 8-321 is void for vagueness as it does not provide any standards for a determination of whether personal property is being unlawfully "stored."  Nor does it provide any time period, whether seconds, minutes, or hours that would assist in a determination of whether a person is "storing" property in violation of the ordinance.

76.     Section 8-321 fails to establish minimal guidelines to govern law enforcement and CITY officials, granting them unbridled discretion to distinguish between unlawful and innocent behavior and allowing arbitrary and discriminatory enforcement.

77.     Due to lack of minimal guidelines, law enforcement officials have arbitrarily and contradictorily enforced the ordinance by providing differing information related to the amount of property people are allowed to have in public spaces and whether individuals may allow another individual to attend to or watch over their property.

78.     Vagueness permeates the law and the unconstitutional portions of § 8-321 are so inherent to its meaning that they cannot be severed from the ordinance.

79.     The entire ordinance is unconstitutional in violation of the Procedural Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

## COUNT 2

### Section 8-321 (Ordinance Restricting Outdoor Storage of Property) is facially unconstitutional in violation of the Procedural Due Process Clause Of The 14h Amendment, U.S. Constitution 42 U.S.C. § 1983

80.     Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

The Ordinance:

81.     Section 8-321 is an official policy of the CITY.  *See* Ex. B.

82.     In public parks, the CITY has posted permanent signs that state that all unattended property will be immediately removed from the park pursuant to § 8-321(d)(4).

83.     Signs may be posted on public property stating that unattended items may be removed immediately without any additional notice under only three enumerated conditions listed in the ordinance: (i) in public rights-of-way to clear an area in advance of pre-planned public events, (ii) in public rights-of-way around public buildings which are likely targets for placement of explosive devices by terrorists, and

19

(iii) in areas determined by the CITY for an area-wide cleanup.  *See* § 8-321(d)(4).

84.    The signs in public parks do not fall under any of the three conditions listed in § 8-321(d)(4).

85.    A person who has "unlawfully stored" such items on public property must remove the items within 36 hours after having been served with "written notice."

86.    Section 8-321(g)(2) requires that the notice contain the following:

a.    A complete description of the items to be removed (such description may refer to an attached photograph),

b.    The location of the property,

c.    The section of the Code in violation,

d.    The location to which the items will be removed,

e.    The date and time by which the items must be removed from the private or public property, and

f.    The date by which the item(s) must be claimed from the location where they are being stored."

87.    If the individual fails to remove any item within 36 hours after having been served with the notice, the CITY may remove the items.  § 8-321(d)(1).

88.    The ordinance specifies that "[m]oving the unlawfully stored items to another location on public property shall not be considered to be removing the item from public property."  § 8-321(3).

89.     The CITY "may dispose of the items after 30 days after removal from the public property." § 8-321(d)(5).

90.     If the owner "wishes to retrieve the items, adequate proof of ownership and payment to the City of reasonable charges for storage and removal of the items are required." *Id.*

91.     The ordinance states that the term "'reasonable charges' shall mean that the POD shall take into consideration the owner's ability to pay the charges." § 8-321(h).

92.     For notices related to removal of items on **private** property, the ordinance requires that the notice contain notification that a hearing may be held at the owner's request.  If requested, a hearing must be held before removal of any item.  See § 8-321(g)(3).

93.     The ordinance does not contain any similar provisions for a hearing for items stored on **public** property. *See id.*

94.     The ordinance does not list any criminal penalties for a violation of § 8-321 nor does it cross-reference to another section of the City Code that deals with general violations of the Code.  However, Section 1-7, St. Petersburg City Code, states "[e]xcept as otherwise provided, a person convicted of a violation of this Code shall be punished by a fine not exceeding $500.00, imprisonment for a term not exceeding 60 days or by any combination thereof.  With respect to violations of this

Code that are continuous with respect to time, each day the violation continues is a separate offense." § 1-7(c).  *See* Ex. C.

Specific Allegations as to the Plaintiffs' Facts:

REYNOLDS

95.     When REYNOLDS has been unable to obtain shelter, she has had no access to private property to store her personal belongings

96.     On February 10, 2009, REYNOLDS was issued a written notice entitled "Notice to The Owner and All Persons Interested in the Affected Property" (Reynolds's Notice) (SPPD # 2009-9274).  The Notice was issued pursuant to § 8-321 of the St. Petersburg City Code.  *See* Ex. D.

97.     At the time, REYNOLDS was sleeping on public sidewalks in the CITY. Since she did not have access to shelter or a place to store her belongings, REYNOLDS had everything that she could fit into one bag that she hangs on her wheelchair.  REYNOLDS' boyfriend had several bags and he also carried blankets for REYNOLDS and other personal belongings she could not carry in her wheelchair.

98.     REYNOLDS was sitting in her wheelchair with her personal belongings and her boyfriend's belongings on a park bench beside her when she was issued her notice, which was hand delivered to her by a SPPD officer.

99.     REYNOLDS' Notice stated that: "This property: 2 duffel bag (1 grn 1 camo), 1 blue backpack is unlawfully stored upon public property known as Williams

Park must be removed within thirty-six (36) hours from the date and time of this notice; otherwise it will be removed and stored at: A City Storage Facility."

100.   REYNOLDS' Notice specified that: "Moving unlawfully stored items to another location on public property or right of way shall no [sic] constitute compliance with the ordinance."

101.   REYNOLDS was told by the officer that having more than two bags is considered storage on public property.

102.   Since "moving unlawfully stored items to another location on public property shall not be considered to be removing the item from public property," REYNOLDS is faced with being in continuous violation of the ordinance for merely owning personal property and having these belongings with her in the public places where she is forced to live.  *See* § 8-321(3).

SHUMATE

103.   SHUMATE had personal property confiscated by the CITY while he was in a CITY park on three different occasions.  He asked other individuals to watch his belongings while he left the park temporarily to use the bathroom or go to the store. When he returned to the park, his belongings had been taken.  SHUMATE and other homeless individuals have been told by CITY officials that people are not allowed to watch other individuals' belongings.  If the owner is not present, then the property is considered to be "unattended" for purposes of enforcement of the law pursuant to the CITY's policy, practice or custom.

23

104.   SHUMATE was not provided with instructions on how to retrieve this personal property.  After speaking with people in the parks department, SHUMATE was given a phone number and told to call a CITY employee to make an appointment to go to the storage facility.  Out of the three times SHUMATE's belongings were taken, he was only able to retrieve the belongings seized on one occasion.  As a result, SHUMATE was unable to retrieve his personal belongings, resulting in permanent deprivation of his personal property without notice or an opportunity to be heard.

105.   Since "moving unlawfully stored items to another location on public property shall not be considered to be removing the item from public property," SHUMATE is faced with being in continuous violation of the ordinance for merely owning personal property and having these belongings with him in the "public places" where he is forced to live.  *See* § 8-321(3).

YOUNG

106.   On March 11, 2009, YOUNG was on a park bench on the south side of Central Avenue with his personal belongings.  He had a cart with two suitcases, a few bags, clothes, hygiene products and other personal belongings.  He had just received his food stamps and had gone grocery shopping so he also had a bag of groceries.

107.   A police officer came up to the park bench where YOUNG was sitting and told him he had "too much stuff."  He said YOUNG was only allowed to have two bags, one backpack and one blanket.

24

108.   The officer arrested YOUNG for outdoor storage of personal property pursuant to Section 8-321 and also on an open container charge.  YOUNG did not receive a written notice that he was in violation of Section 8-321 prior to being arrested although the police officer stated in the report that he had been previously warned.  *See* Ex. E.

109.   YOUNG'S property was also seized at the time of his arrest.  While the CITY did not give YOUNG information about where his property was being stored or how to retrieve his personal belongings, YOUNG on his own initiative was able to find out how to retrieve his belongings and was able to successfully do so.

110.   Since "moving unlawfully stored items to another location on public property shall not be considered to be removing the item from public property," YOUNG is faced with being in continuous violation of the ordinance for merely owning personal property and having these belongings with him in the public places where he is forced to live.  *See* § 8-321(3).

111.   Since his arrest, YOUNG has been warned by other police officers that he needs to downsize, and he has discarded personal belongings to comply with these orders.  For example, in June of 2009, he was told by a St. Petersburg police officer that he had "too much stuff" and was allowed to have only one suitcase and two blankets.  He was told belongings would be seized if he did not comply with the officer's directives.

112.   Other putative class members have had personal property removed

from CITY parks and other public areas without adequate notice and without notice of how to retrieve their personal belongings or opportunity for a hearing to contest the determination that the property was "unlawfully stored."   This has resulted in temporary and/or permanent deprivation of Plaintiffs and putative class members' property.

Legal Claim:

113.   The ordinance on its face violates procedural due process as it does not provide either a pre- or post-deprivation hearing process for Plaintiffs and putative class members to challenge the determination that their property is unlawfully "stored" in violation of the ordinance.

114.   Plaintiffs and putative class members have been denied a pre- or post-deprivation hearing process to challenge the determination that their property is unlawfully "stored" in violation of the ordinance.

115.   As Plaintiffs and putative class members live a marginal existence without sufficient funds to provide for the basic necessities of life, including, but not limited to private places to store their personal property, there is no adequate state law post-deprivation remedy available to them.

116.   Section 8-321 deprives Plaintiffs and putative class members of constitutionally protected property interests without adequate notice and an opportunity to be heard in violation of the Procedural Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

## COUNT 3

**Section 8-321 (Ordinance Restricting Outdoor Storage of Property) is being applied unconstitutionally in violation of the Procedural Due Process Clause Of The 14ʰ Amendment, U.S. Constitution 42 U.S.C. § 1983**

117.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

Defendant's Policies, Practices or Customs:

118.   Section 8-321 is an official policy of the CITY.  *See* Ex. B.

119.   Defendant CITY has a policy, custom and/or practice of conducting property sweeps and seizures on public sidewalks, in public parks, and in other public areas throughout the CITY pursuant to Section 8-321, depriving Plaintiffs and putative class members of constitutionally protected property interests with inadequate process.

120.   Defendant CITY has a policy, custom and/or practice of enforcing Section 8-321 against homeless individuals to limit the amount of belongings they are allowed to own and have with them in public parks, on streets, sidewalks and other public places where they live.

121.   Defendant CITY has a policy, custom and/or practice of seizing property from homeless individuals if they are not able to demonstrate that they are able to carry all of their belongings at one time.

27

122.   Defendant CITY has a policy, custom and/or practice of seizing "unattended" property from CITY parks without notice or an opportunity to be heard. Defendant CITY interprets the term "unattended" to mean that the owner has to be with his property at all times and no one may attend to or watch over another individual's property.

Specific Allegations as to the Plaintiffs' Facts:

REYNOLDS

123.   When REYNOLDS has been unable to obtain shelter, she has had no access to private property to store her personal belongings.

124.   On February 10, 2009, REYNOLDS was issued a written notice entitled "Notice to The Owner and All Persons Interested in the Affected Property" (Reynolds's Notice) (SPPD # 2009-9274).  The Notice was issued pursuant to § 8-321 of the St. Petersburg City Code.  *See* Ex. D.

125.   At the time, REYNOLDS was sleeping on public sidewalks in the CITY. Since she did not have access to shelter or a place to store her belongings, REYNOLDS had everything that she could fit into one bag that she hangs on her wheelchair.  REYNOLDS' boyfriend had several bags and he also carried blankets for REYNOLDS and other personal belongings she could not carry in her wheelchair.

126.   REYNOLDS was sitting in her wheelchair with her personal belongings and her boyfriend's belongings on a park bench beside her when she was issued her notice, which was hand delivered to her by a SPPD officer.

28

127.   REYNOLDS' Notice stated that: "This property: 2 duffel bag (1 grn 1 camo), 1 blue backpack is unlawfully stored upon public property known as Williams Park must be removed within thirty-six (36) hours from the date and time of this notice; otherwise it will be removed and stored at: A City Storage Facility."

128.   REYNOLDS' Notice specified that: "Moving unlawfully stored items to another location on public property or right of way shall no [sic] constitute compliance with the ordinance."

129.   REYNOLDS was told by the officer that having more than two bags is considered storage on public property.  The ordinance does not provide notice of the amount of personal property people are allowed to have.

130.   Due to the lack of adequate pre- or post-deprivation hearing process to challenge the determination of whether her property is "unlawfully stored" on "public property" in violation of the ordinance, REYNOLDS is faced with the choice of abandoning personal belongings that she owns or being in continuous violation of this ordinance as it is being applied.

131.   REYNOLDS has discarded some of her personal property to comply with SPPD officers' instructions regarding the amount of property she is allowed to have without violating the ordinance.

132.   When REYNOLDS is not able to obtain shelter, she is afraid of having her belongings taken by the CITY and/or being cited or arrested for violating the ordinance.

<u>SHUMATE</u>

133.   When SHUMATE is not able to obtain shelter, he has had no access to private property to store his personal belongings.  SHUMATE had personal property confiscated by the CITY while he was in a CITY park on three different occasions. He asked other individuals to watch his belongings while he left the park temporarily to use the bathroom or go to the store.  When he returned to the park, his belongings had been taken.  SHUMATE and other homeless individuals have been told by CITY officials that people are not allowed to watch other individuals' belongings.  If the owner is not present, then the property is considered to be "unattended" for purposes of enforcement of the law pursuant to the CITY's policy, practice or custom.

134.   SHUMATE was not provided with instructions on how to retrieve this personal property.  After speaking with people in the parks department, SHUMATE was given a phone number and told to call a CITY employee to make an appointment to go to the storage facility. Out of the three times SHUMATE's belongings were taken, he was only able to retrieve the belongings seized on one occasion.  As a result, SHUMATE was unable to retrieve his personal belongings, resulting in permanent deprivation of his personal property without notice or an opportunity to be heard.

135.   Due to the lack of adequate pre- or post-deprivation hearing process to challenge the determination of whether his property is "unlawfully stored" on "public

property" in violation of the ordinance, SHUMATE was permanently deprived of his personal property without notice or an opportunity to be heard.

136.    When SHUMATE is not able to obtain shelter, he is afraid of having his belongings taken by the CITY and/or being cited or arrested for violating the ordinance.

YOUNG

137.    On March 11, 2009, YOUNG was on a park bench on the south side of Central Avenue with his personal belongings.  He had a cart with two suitcases, a few bags, clothes, hygiene products and other personal belongings.  He had just received his food stamps and had gone grocery shopping so he also had a bag of groceries.

138.    A police officer came up to the park bench where YOUNG was sitting and told him he had "too much stuff."  He said YOUNG was only allowed to have two bags, one backpack and one blanket.

139.    The officer arrested YOUNG for outdoor storage of personal property pursuant to Section 8-321 and also on an open container charge.  YOUNG did not receive a written notice that he was in violation of Section 8-321 prior to being arrested although the police officer stated in the report that he had been previously warned. *See* Ex. E.

140.    YOUNG'S property was also seized at the time of his arrest.  While the CITY did not give YOUNG information about where his property was being stored or

how to retrieve his personal belongings, YOUNG on his own initiative was able to find out how to retrieve his belongings and was able to successfully do so.

141.   Since "moving unlawfully stored items to another location on public property shall not be considered to be removing the item from public property," YOUNG is faced with being in continuous violation of the ordinance as it is being applied for merely owning personal property and having these belongings with him in the public places where he is forced to live.  *See* § 8-321(3).

142.   Since his arrest, YOUNG has been warned by other police officers that he needs to downsize, and he has discarded personal belongings to comply with these orders.  For example, in June of 2009, he was told by a St. Petersburg police officer that he had "too much stuff" and was allowed to have only one suitcase and two blankets.  If he did not comply with the officer's directives, he was told his belongings would be seized.

143.   Other putative class members have had personal property removed from CITY parks and other public areas without adequate notice and without notice of how to retrieve their personal belongings or an opportunity for a hearing to contest the determination that the property was "unlawfully stored."  This has resulted in temporary and/or permanent deprivation of Plaintiffs' and putative class members' property.

144.   During "area-wide" sweeps near St. Vincent de Paul, a homeless service provider located in St. Petersburg, the CITY has posted signs entitled "Notice

to the Owner and All Persons Interested in the Affected Property," at various times since 2008.   *See* 8-321(d)(4)(iii)(describing authority to conduct area-wide "clean-up[s]").

145.   One such notice, posted on December 31, 2008, stated "This property: All Property located within 25 feet of this Notice on Public Right of Way or Public Property is unlawfully upon public property known as: 15th Street North between 4th Ave N and 5th Ave N and must be removed within 36 hours from the date and time of this notice; otherwise it will be removed and stored at: 1675 5th Ave. N."

146.   After posting such notices, CITY officials have confiscated putative class members' personal belongings.   During these sweeps, people are told they are only allowed to keep what they can carry and/or they are given specific instructions on the number of bags and blankets they are allowed to have.   CITY officials confiscate belongings that are deemed in "excess" of the amount of property people are allowed to own.

147.   As a result of these property sweeps, the CITY has confiscated personal belongings including bedding, blankets, clothes and other personal items from Plaintiffs and putative class members.

148.   Plaintiffs and putative class members fear they will be cited and/or arrested for violating this ordinance.

149.   The CITY has failed to establish adequate procedural safeguards to enable Plaintiffs and putative class members to claim their property within the 30 day

33

time limit established by § 8-321(5). This has resulted in permanent deprivation of Plaintiffs and putative class members' personal property.

150. As Plaintiffs and putative class members live a marginal existence without sufficient funds to provide for the basic necessities of life, including, but not limited to personal property, there is no adequate state law post-deprivation remedy available to them.

151. Neither the ordinance nor the CITY has provided Plaintiffs or putative class members an opportunity for a hearing to contest the determination that their property has been unlawfully "stored" on public property in violation of the ordinance.

Legal Claim:

152. Section 8-321 is being applied in an unconstitutional manner to Plaintiffs and putative class members in violation of the Procedural Cause of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

153. Defendant CITY has a policy, custom and/or practice of conducting property sweeps and seizures in public parks, on public sidewalks, and in other public areas throughout the CITY, utilizing constitutionally inadequate procedures to temporarily and/or permanently deprive Plaintiffs and putative class members of their personal property.

154. Defendant's widespread and persistent practice of using § 8-321 to seize property belonging to Plaintiffs and putative class members has temporarily and/or permanently deprived them of their property and caused them injury, due to

34

lack of an adequate pre- or post-deprivation hearing process to challenge the determination that their property is unlawfully "stored" on "public property" in violation of the ordinance.

155.   The CITY has not established procedural safeguards to protect against the arbitrary deprivation of Plaintiffs' and putative class members' personal property.

156.   Plaintiffs and putative class members have been denied a pre- or post-deprivation hearing process to challenge the determination that their property is unlawfully "stored" on "public property" in violation of the ordinance.

157.   As Plaintiffs and putative class members live a marginal existence without sufficient funds to provide for the basic necessities of life, including, but not limited to private places to store their personal property, there is no adequate state law post-deprivation remedy available to them.

158.   Defendant's policies, practices or customs are unconstitutional as-applied to Plaintiffs and putative class members in violation of the Procedural Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

## COUNT 4

**Section 20-30 (authorization to issue trespass warnings for public property) is void for vagueness in violation of the Procedural Due Process Clause of the Fourteenth Amendment
U.S. Constitution
42 U.S.C. § 1983**

159.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue);

35

paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

<u>The Ordinance</u>:

160.   Section 20-30 is an official policy of the CITY.  A copy of the ordinance is attached as Exhibit F.

161.   Section 20-30 of the City Code authorizes CITY employees, officials, or their designees, and police officers to issue trespass warnings for public property, including municipal parks.  *See* Ex. F.

162.   The ordinance provides that "city employees or officials, or their designees, having control over a facility, building, or outdoor area, including municipal parks, are authorized to issue a trespass warning to any individual who violates any city ordinance, rule or regulation, or state law or lawful directive of a city employee or official."  § 20-30(a).

163.   When no other CITY employee or official is present, the ordinance authorizes a police officer "to issue a trespass warning to any individual who violates any City ordinance or state law which was committed while on or within a City-owned facility, building, or outdoor area, including municipal parks (but excluding rights-of-way)."  § 20-30(b).

164.   The ordinance does not apply to "rights-of-way" but does not define "rights-of-way."   Individuals are not put on notice whether public sidewalks are included in the definition of rights-of-way.

36

165.   Sidewalks are included in the definition of public parks elsewhere in the CITY Code.  However, they must remain open 24 hours a day. § 21-61(b).

166.   Due to these ambiguities, individuals are not put on notice of whether public sidewalks are considered part of the public parks, and therefore included in the trespass ordinance, or if they are considered part of the public right-of-way and therefore excluded from the trespass ordinance's provisions.  *Compare* § 20-30(b) with § 21-61(b).

167.   Prior to issuing a trespass warning, "the police officer must receive the approval of the officer's immediate supervisor for the issuance of the trespass warning."  § 20-30(b).

168.   Trespass warnings issued pursuant to § 20-30 are permitted "for the specific property where the violation occurred."  § 20-30(a) & (b).

169.   An individual *may* be issued a trespass warning "for a period *not to exceed one year*" for the first violation of the ordinance.  § 20-30(c)(1) (emphasis supplied).  No standards are established regarding how a determination is to be made as to the length of the time within a period of one year in which the trespass warning will be in force.

170.   For subsequent violations, an individual *may* be issued a trespass warning "for a period *not to exceed two years*."  § 20-30(c)(2) (emphasis supplied).  No standards are established regarding how a determination is to be made as to the

37

length of the time within a period of two years in which the trespass warning will be in force.

171.   Any individual who has previously been issued a trespass warning and is "found on or within any City-owned facility, building, or outdoor area, including municipal parks in violation of a trespass warning may be arrested for trespassing." § 20-30(e).

172.   A CITY employee or official, having control over the area where an individual has been trespassed, "may authorize an individual who has received a trespass warning to exercise his or her First Amendment rights or to conduct necessary municipal business." § 20-30(f).

173.   The ordinance states that the "authorization must be in writing, specify the duration of the authorization and any conditions thereof, and shall not be unreasonably denied." § 20-30(f).

174.   The ordinance does not contain narrow, objective and definite standards to guide the CITY employee or official in determining whether to issue this authorization to exercise "First Amendment rights." *See* § 20-30(f).

175.   The ordinance is overbroad in that it does not contain a definition of First Amendment rights which may include, *inter alia*, the right to associate with friends such as attendance at a picnic, the right to attend a rally or a political event.

176.   The ordinance grants total discretion to a CITY official to grant or deny a request to enter the property for exercising "First Amendment rights." *Id.*

38

177.   The ordinance does not set forth any time limits in which the CITY official must begin or complete his review of the request to enter the property for grant or denial of the permit to exercise of First Amendment rights.  *Id.*

178.   The ordinance does not provide a process for judicial review of an individual's request to exercise his or her protected First Amendment rights.  *Id.*

179.   The ordinance explicitly states that its provisions "shall not be construed to limit the authority of any City employee or official to issue a trespass warning to any person for any lawful reason for any City property...when necessary or appropriate in the sole discretion of the City employee or official."  § 20-30(g).

180.   The ordinance does not define "lawful reason" as used in § 20-30(g).

181.   The SPPD has issued an instructional order, effective November 2007, that describes procedures for the issuance of trespass warnings.  Instructional Order, Trespassing, V.5:32.  A copy of this instructional order is attached as Exhibit G.

182.   This instructional order is an official policy of the SPPD.  *See id.* at § I (Purpose).

183.   The instructional order includes a copy of the Trespass Warning Form used by the SPPD (Form SPPD-04-047).  *See* Ex. G.

Specific Allegations as to Plaintiffs' Facts:

CATRON

184.   On August 23, 2006, a SPPD officer issued CATRON a Trespass Warning for public property (SPPD # 2006-54095)[8].   The Trespass Warning states that CATRON will be subject to arrest if he is found on the following property: "all of Williams Park" and "all City parks."   The Trespass Warning states that it will remain in effect "permanently."   A copy of this Trespass Warning is attached as Exhibit H.

185.   The trespass ordinance does not authorize the issuance of a "permanent" trespass warning for public property.   *See* § 20-30(c).

186.   CATRON's Trespass Warning, issued for all CITY parks, violates the ordinance's own directive that such warnings should be issued "for the specific property where the violation occurred."   § 20-30(a) & (b).

187.   On August 29, 2007, a SPPD officer issued CATRON a Trespass Warning for public property (SPPD # 2007-194606).   This Trespass Warning was to be in effect for one year.   A copy of this Trespass Warning is attached as Exhibit I.

188.   CATRON was not cited or arrested for any criminal violation at the time he was issued this Trespass Warning.

189.   Although the 2007 Trespass Warning fails to specifically describe the public property that is the subject of this written warning, Catron was told that it was for Williams Park.

190.   CATRON was not inside of the park when he was issued this warning, but was on a public sidewalk.

---

[8]Documents such as Trespass Warnings and arrest reports referenced in this complaint are in the possession, custody and control of the SPPD.  Some of these reports have been obtained by counsel for Plaintiffs pursuant to public records requests under Ch. 119, Fla. Stat.  Where available, the citations refer to either the SPPD report number, incident number and/or case number.

191.   Neither of these Trespass Warnings issued to CATRON state the underlying violation that authorized the police officer to issue these written warnings.

192.   Neither of these Trespass Warnings issued to CATRON indicate whether the police officer obtained supervisory approval **prior** to issuing the written warning pursuant to Section 20-30(b).

193.   Officers from the SPPD have arrested CATRON ten times for trespass after warning under Fla. Stat. 810.08 and/or 810.09 due to Trespass Warnings issued pursuant to Section 20-30 for being present in Williams Park at times when the park was open to the general public.

194.   CATRON has served time in jail and been assessed court costs and fines for these arrests for trespass after warning.

195.   Officers from the SPPD have told CATRON that the Trespass Warning for Williams Park applies "curb to curb."  They have told him that he is not allowed to walk on the sidewalks outside of Williams Park, use the public restrooms, or to be in any of the bus shelters outside of the park even if he were waiting for a CITY bus.

196.   CATRON was arrested by a SPPD officer on January 30, 2008 for trespass after warning for sitting on the "retaining wall on the west portion of the park."  The arrest report states that CATRON had been previously warned that the Trespass Warning "included curb to curblines of the park." (SPPD # 2008-6000).  A copy of this arrest report is attached as Exhibit J.

YOUNG

197.   On July 28, 2008, YOUNG was issued a Trespass Warning for Williams Park (SPPD # 08-43700) by a CITY police officer.  A copy of this Trespass Warning is attached as Exhibit K.

198.   YOUNG'S Trespass Warning does not indicate whether the police officer obtained supervisory approval *prior* to issuing the written warning pursuant to Section 20-30(b).

199.   YOUNG'S Trespass Warning does not state the underlying violation that authorized the police officer to issue this written warning although it indicates he was arrested for an unidentified offense.

200.   YOUNG was arrested on July 28, 2008 on the charge of "alcohol in a City park."  This charge was dropped and no information was ever filed in the case.

201.   Even though YOUNG was never prosecuted nor convicted of the alleged violation of alcohol in a CITY park, YOUNG still was prohibited from being in the park pursuant to the Trespass Warning for a period of one year or he would be arrested.

202.   YOUNG has been cited and/or arrested for trespass after warning, incarcerated, and assessed court costs and fines due to this Trespass Warning.

Legal Claim:

203.   Section 20-30 is void for vagueness as it does not convey sufficiently definite warning of what conduct triggers issuance of a Trespass Warning.  For example, the ordinance authorizes the issuance of Trespass Warnings for violations

42

of any CITY ordinance or state law but does not define a "violation." It is unclear if a violation requires an individual to actually be charged and convicted with a CITY ordinance or state statute prior to the issuance of a Trespass Warning.

204.   Section 20-30 fails to establish minimal guidelines for CITY officials and police officers, granting them unfettered discretion to determine when a "violation" occurs that triggers issuance of a Trespass Warning.  CITY officials and police officers are authorized and encouraged by this vague law to pursue their personal predilections, leading to arbitrary and discriminatory enforcement.

205.   The ordinance also fails to establish sufficient guidelines for CITY officials and police officers to determine how long a Trespass Warning may be issued.  No standards are established regarding how a determination is to be made as to the length of the time in which the trespass warning will be in force.  Instead, this determination is left to the sole discretion of CITY officials and police officers, authorizing and encouraging arbitrary and discriminatory enforcement.  § 20-30(c).

206.   The ordinance fails to establish sufficient guidelines and procedural safeguards for CITY officials to grant or deny permission to individuals who have been issued Trespass Warnings for a CITY park, for example, to enter that park for the purpose of exercising their "First Amendment rights."  The ordinance grants unfettered discretion to CITY employees to authorize or deny access to traditional public fora for the purposes of exercising protected "First Amendment rights."

207.   Vagueness permeates the law and the unconstitutional provisions of § 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

43

## COUNT 5

**Section 20-30 is facially unconstitutional in violation of the Procedural Due
Process Clause of the Fourteenth Amendment
U.S. Constitution
42 U.S.C. § 1983**

208.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

The Ordinance:

209.   Section 20-30 is an official policy of the CITY.  A copy of the ordinance is attached as Exhibit F.

210.   The ordinance does not provide for any review whatsoever, whether administrative or judicial, to contest whether the person subject to the warning committed a violation of "any City ordinance or state law" as authorized by § 20-30(b).

211.   The ordinance does not provide for any review whatsoever, whether administrative or judicial, to contest the length of time a person is banned from public property pursuant to the Trespass Warning.

212.   The trespass ordinance does not authorize the issuance of a "permanent" trespass warning for public property.  See § 20-30(c).

Defendant's Policies, Practices and/or Customs:

213.   Section 20-30 is an official policy of the CITY.   See Ex. F.

44

214.   Defendant CITY has a policy, custom and/or practice of utilizing municipal ordinances and state trespass laws to arrest, cite, harass and otherwise prohibit Plaintiffs and the putative class from being in public spaces, particularly municipal parks, for the purpose of driving them from public areas.

215.   Defendant CITY has a policy, custom and/or practice of enforcing the trespass laws to prohibit Plaintiffs and putative class members from being present on public sidewalks surrounding public parks, waiting for buses at bus shelters located on public sidewalks surrounding public parks, and using public bathrooms located inside public parks.

Specific Allegations as to Plaintiffs' Facts:

CATRON

216.   On August 23, 2006, a SPPD officer issued CATRON a Trespass Warning for public property (SPPD # 2006-54095)[9].  The Trespass Warning states that CATRON will be subject to arrest if he is found on the following property: "all of Williams Park" and "all city parks."  The Trespass Warning states that it will remain in effect "permanently."  Ex. H.

217.   CATRON's Trespass Warning, issued for all CITY parks, violates the ordinance's own directive that such warnings should be issued "for the specific property where the violation occurred."  § 20-30(a) & (b).

218.   On August 29, 2007, a SPPD officer issued CATRON a Trespass

---

[9]Documents such as Trespass Warnings and arrest reports referenced in this complaint are in the possession, custody and control of the SPPD.  Some of these reports have been obtained by counsel for Plaintiffs pursuant to public records requests under Ch. 119, Fla. Stat.  Where available, the citations refer to either the SPPD report number, incident number and/or case number.

Warning for public property (SPPD # 2007-194606).  This Trespass Warning was to be in effect for one year.  *See* Ex. I.

219.   CATRON was not cited or arrested for any criminal violation at the time he was issued this Trespass Warning.

220.   Although the 2007 Trespass Warning fails to specifically describe the public property that is the subject of this written warning, CATRON was told that it was for Williams Park.

221.   Neither of these Trespass Warnings issued to CATRON state the underlying violation that authorized the police officer to issue these written warnings.

222.   Neither of these Trespass Warnings issued to CATRON indicate whether the police officer obtained supervisory approval *prior* to issuing the written warning pursuant to Section 20-30(b).

223.   Officers from the SPPD have arrested CATRON ten times for trespass after warning under Fla. Stat. 810.08 and/or 810.09 due to Trespass Warnings issued pursuant to Section 20-30 for being present in Williams Park at times when the park was open to the general public.

224.   CATRON has served time in jail and been assessed court costs and fines for these arrests for trespass after warning.

225.   Officers from the SPPD have told CATRON that the Trespass Warning for Williams Park applies "curb to curb."  They have told him that he is not allowed to walk on the sidewalks outside of Williams Park, use the public restrooms, or to be in any of the bus shelters outside of the park even if he were waiting for a CITY bus.

46

226.   CATRON was arrested by a SPPD officer on January 30, 2008 for trespass after warning for sitting on the "retaining wall on the west portion of the park."  The arrest report states that CATRON had been previously warned that the Trespass Warning "included curb to curblines of the park." (SPPD # 2008-6000).  Ex. J.

YOUNG

227.   On July 28, 2008, YOUNG was issued a Trespass Warning for Williams Park (SPPD # 08-43700) by a CITY police officer.  Ex. K.

228.   YOUNG'S Trespass Warning does not indicate whether the police officer obtained supervisory approval *prior* to issuing the written warning pursuant to Section 20-30(b).

229.   YOUNG'S Trespass Warning does not state the underlying violation that authorized the police officer to issue this written warning although it indicates he was arrested for an unidentified offense.

230.   YOUNG was arrested on July 28, 2008 on the charge of "alcohol in a city park."  This charge was dropped and no information was ever filed in the case.

231.   Even though YOUNG was never prosecuted nor convicted of the alleged violation of alcohol in a CITY park, YOUNG still was prohibited from being in the park pursuant to the Trespass Warning for a period of one year or he would be arrested.

232.   YOUNG has been cited and/or arrested for trespass after warning, incarcerated, and assessed court costs and fines due to this Trespass Warning.

47

Legal Claim:

233.   Section 20-30 violates procedural due process as it deprives Plaintiffs and putative class members of constitutionally protected interests without any opportunity to either a pre- or post-deprivation hearing to contest the facts underlying the issuance of a trespass warning.

234.   The unconstitutional portions of Section 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

## COUNT 6

**Section 20-30 is unconstitutional as-applied in violation of the Procedural Due Process Clause of the Fourteenth Amendment U.S. Constitution 42 U.S.C. § 1983**

235.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

Defendant's Policies, Policies, Practices or Customs:

236.   Section 20-30 is an official policy of the CITY. *See* Ex. F.

237.   Defendant CITY has a policy, custom and/or practice of utilizing municipal ordinances and state trespass laws to arrest, cite, harass and otherwise prohibit Plaintiffs and the putative class from being in public spaces, particularly municipal parks, for the purpose of driving them from public areas.

238.   Defendant CITY has a policy, custom and/or practice of enforcing the

48

trespass laws to prohibit Plaintiffs and putative class members from being present on public sidewalks surrounding public parks, waiting for buses at bus shelters located on public sidewalks surrounding public parks, and using public bathrooms located inside public parks.

Specific Allegations as to Plaintiffs' Facts:

CATRON

239.    CATRON was issued a Trespass Warning "permanently" for "all city parks." CATRON has not had the opportunity for a review of the time period that the Trespass Warning will remain in effect nor has he had the opportunity to challenge the validity of a Trespass Warning that prohibits him from being in all CITY parks.

240.    CATRON was issued a Trespass Warning in 2007 for public property for one year. The notice fails to specifically describe the public property that CATRON is banned from. At the time CATRON was issued the warning, the police officer told him it was for Williams Park. CATRON was not cited or arrested for any criminal violation at the time he was issued this Trespass Warning nor was he inside the park.

241.    CATRON was denied the opportunity to have any review of the validity of this Trespass Warning, including whether a "violation" occurred or whether the alleged "violation" occurred on the "specific property" he was banned from.

YOUNG

242.    YOUNG was issued a Trespass Warning for an alleged violation of a CITY ordinance that resulted in no information being filed in the criminal court case.

Even though the underlying charge was dropped, YOUNG had no opportunity to contest the issuance of the Trespass Warning.  As a result, YOUNG was barred from entering a CITY park for one year without any opportunity for review of the validity of the Trespass Warning issued for a "violation" of a CITY ordinance that never resulted in a prosecution or conviction.

243.   Plaintiffs and putative class members who have been issued Trespass Warnings for Williams Park have been told by SPPD officers that their Trespass Warnings apply "curb to curb" and that they are not allowed to be on the sidewalks surrounding the park, even if they are waiting for a CITY bus, or they will be arrested for trespass after warning

244.   Plaintiffs and putative class members who have received such trespass warnings for public parks are subject to arrest if they go into those parks even when the parks are open to the general public.  § 20-30(e).

Legal Claim:

245.   The ordinance does not provide for any review whatsoever, whether administrative or judicial, to contest whether the person subject to the warning committed a violation of "any city ordinance or state law" as authorized by § 20-30(b).

246.   The ordinance does not provide for any review whatsoever, whether administrative or judicial, to contest the length of time a person is banned from public property pursuant to the Trespass Warning.

247.   The ordinance does not provide for any review whatsoever, whether administrative or judicial, to determine whether the Trespass Warning was properly

issued "for the specific property where the violation occurred."

248.   Section 20-30 violates procedural due process as it deprives Plaintiffs and putative class members of constitutionally protected interests without constitutionally adequate process.

249.   The unconstitutional portions of Section 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

250.   The ordinance violates the Procedural Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

## COUNT 7

**Section 20-30 is facially unconstitutional in violation of the First Amendment U.S. Constitution**
**42 U.S.C. § 1983**

251.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

The Ordinance:

252.   Section 20-30 is an official policy of the CITY.  *See* Ex. F.

253.   Section 20-30 of the City Code authorizes CITY employees, officials, or their designees, and police officers to issue trespass warnings for public property, including municipal parks.

254.   A CITY employee or official, having control over the area where an individual has been trespassed, "may authorize an individual who has received a

trespass warning to exercise his or her First Amendment rights or to conduct necessary municipal business." § 20-30(f).

255.   The ordinance states that the "authorization must be in writing, specify the duration of the authorization and any conditions thereof, and shall not be unreasonably denied." § 20-30(f).

256.   The ordinance does not contain narrow, objective and definite standards to guide the CITY employee or official in determining whether to issue this authorization to exercise "First Amendment rights." *See* § 20-30(f).

257.   The ordinance is overbroad in that it does not contain a definition of First Amendment rights which might include, *inter alia*, the right to associate with friends such as attendance at a picnic or the right to attend a rally.

258.   The ordinance grants total discretion to a CITY official to grant or deny a request to enter the property for exercising "First Amendment rights." *Id.*

259.   The ordinance explicitly states that its provisions "shall not be construed to limit the authority of any city employee or official to issue a trespass warning to any person for any lawful reason for any city property...when necessary or appropriate in the sole discretion of the city employee or official." § 20-30(g).

260.   The ordinance does not define "lawful reason" as used in § 20-30(g).

Specific Allegations as to the Plaintiffs' Facts:

261.   Named Plaintiffs and putative class members who have been issued Trespass Warnings wish to engage in protected First Amendment activity in public parks but are prohibited from doing so without first applying for and receiving

permission from the CITY.  *See* § 20-30(f).

262.   Named Plaintiffs and putative class members who have been issued Trespass Warnings and wish to engage in protected First Amendment activity in public parks fear they will be cited and/or arrested for doing so.

263.   Named Plaintiffs and putative class members who have received trespass warnings for public parks and wish to engage in protected First Amendment activity in these traditional public fora are prohibited from doing so without first applying and receiving permission from the CITY.

Legal Claim:

264.   Section 20-30 fails to contain narrow, objective and definite standards to guide the CITY officials in determining whether to grant permission to enter the parks for the purposes of exercising these "First Amendment rights."  The law also lacks procedural safeguards to guard against unlawful infringement on protected First Amendment activity.

265.   Section 20-30 fails to establish substantive constraints on the CITY official who reviews requests to ensure against arbitrary and discriminatory limitations on protected First Amendment activity; provide for prompt judicial review; or place time constraints on issuance or denial of authorizations.

266.   Section 20-30 grants overly broad discretion to CITY officials and fails to allow for spontaneous speech activity in traditional public fora, such as municipal parks.  On its face, § 20-30 is an overbroad restriction that sweeps into its ambit a substantial amount of constitutionally protected speech.

267.   The unconstitutional portions of § 20-30 are so inherent to its meaning that they cannot be severed from the ordinance.

## COUNT 8

### Section 20-30 is unconstitutional as-applied to Plaintiffs and putative class members in violation of the First Amendment U.S. Constitution 42 U.S.C. § 1983

268.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

The Ordinance:

269.   Section 20-30 is an official policy of the CITY.  *See* Ex. F.

Specific Allegations as to the Plaintiffs' Facts:

270.   Named Plaintiffs and putative class members who have been issued Trespass Warnings wish to engage in protected First Amendment activity in public parks but are prohibited from doing so without first applying for and receiving permission from the CITY.  *See* § 20-30(f).

271.   Named Plaintiffs and putative class members who have been issued Trespass Warnings and wish to engage in protected First Amendment activity in public parks fear they will be cited and/or arrested for doing so.

272.   Named Plaintiffs and putative class members who have received trespass warnings for public parks and wish to engage in protected First Amendment

54

activity in these traditional public fora are prohibited from doing so without first applying and receiving permission from the CITY.

Legal Claim:

273. Section 20-30 is being applied in an unconstitutional manner to Plaintiffs and putative class members who have been issued Trespass Warnings for CITY parks and wish to engage in protected First Amendment activity in these traditional public fora.

274. As applied to Named Plaintiffs and putative class members, § 20-30 is an overbroad restriction that sweeps into its ambit constitutionally protected speech.

275. As a direct and proximate cause of the enforcement of § 20-30 pursuant to Defendant's policies, practices and/or customs, Plaintiffs and putative class members who wish to engage in protected First Amendment activity are deprived of their First Amendment rights in quintessential public fora. The ordinance and its application to Plaintiffs and putative class members has a chilling effect on constitutionally protected expression, causing irreparable harm.

## COUNT 9

**Violation of the right to be free from cruel and unusual punishment**
**8th Amendment, U.S. Constitution**
**42 U.S.C. § 1983**

276. Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY; and paragraph 41 (regarding Municipal Liability).

55

Public Urination/Defecation Laws:

277.   Section 20-123 of the City Code makes it unlawful for any person to "[u]rinate or defecate on any public place within the City...or within any portion of the City zoned as a business district or for industrial, or public uses unless such urinating or defecating is made into a receptacle that has been provided for that purpose, that stores or disposes of the wastes in a sanitary manner and that is enclosed from the view of the general public." § 20-123(b)(1).  A copy of this ordinance is attached as Exhibit L.

278.   The ordinance also makes it unlawful to "[d]ump, unload or otherwise dispose of any urine or feces, in or on any public place within the City...or within any portion of the City zoned as a business district or for industrial or public uses other than in areas designated for such purposes." § 20-123(b)(2).

279.   "Public place" is defined to include, but is not limited to, "any street or highway, alley, parking lot, driveway, sidewalk, boulevard, park, beach, wharf, pier, or other place open to the public view." § 20-123(a).

280.   The ordinance's provisions do not apply to children under eleven (11) or to people who "lack the physical or mental ability to control their bodily functions." § 20-123(c).

281.   Section 877.03 of the Florida Statutes provides that "[w]hoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach

of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree." A copy of this statute is attached as Exhibit M.

Defendant CITY's Policies, Practices and/or Customs:

282. Section 20-123 is an official policy of the CITY.

283. Defendant CITY has a policy, custom and/or practice of using Fla. Stat. 877.03 (disorderly conduct) to arrest individuals for public urination/defecation.

284. Defendant CITY has a policy, custom and/or practice of arresting or citing Plaintiffs and the putative class for life sustaining activities such as public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) at times and places where there are no public bathrooms open, available, and accessible to homeless people.

285. Plaintiffs LILE, SHUMATE and putative class members have been arrested for public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) at times and places where there were no public bathrooms open, available, and accessible to them.

286. Named Plaintiffs and putative class members fear they will be cited and/or arrested under these laws at times and places where there are no public bathrooms open, available, and accessible to them.

Specific Allegations as to Plaintiffs' Facts:

LILE

57

287.   On April 25, 2008, SPPD officers arrested LILE for public urination early in the morning when there were no public bathrooms open, available and/or accessible to him.

288.   The bathrooms at St. Vincent de Paul were not open at that time and LILE was not aware of any other public bathrooms in that area that were open at that time.  He urinated behind some bushes while it was still dark outside at or around 6 a.m.

289.   LILE was arrested by SPPD officers under § 20-123 of the City Code (SPPD # 2008-023397).  The police report for this incident states that an officer was conducting surveillance on foot and observed LILE "wake up from sleeping on the sidewalk" near St. Vincent de Paul and he walked over and urinated into hedges located nearby.  A copy of this report is attached as Exhibit N.

290.   LILE was sentenced to 5 days in jail, with two days credit for time served, for public urination and he was assessed fines and costs.  LILE served his sentence and was released on April 28, 2008.

REYNOLDS

291.   REYNOLDS has kidney problems and has difficulty making it through the night.  REYNOLDS does not drink water in the evenings because she is afraid that if she drinks too much water, she will have to use the bathroom in the middle of the night when there are no public bathrooms open.  REYNOLDS does not want to be arrested for public urination.

SHUMATE

292.   SHUMATE is 60 years old and a diabetic.  He has difficulty making it through the night, when public bathrooms are closed, to wait to use the bathroom.

293.   On November 1, 2007, SHUMATE was sleeping on public sidewalks outside of City Hall when he needed to use the bathroom.  Around 1:00 a.m. he went to urinate near the side of the building, and was arrested by a SPPD officer for disorderly conduct, Fla. Stat. 877.03, for public urination (SPPD # 2007-066578).  There were no public bathrooms open, available and/or accessible for SHUMATE to use at that time.  A copy of this report is attached as Exhibit O.

294.   SHUMATE pled guilty to time served, one day in jail, and a fine of $300 for the disorderly conduct (public urination) charge.

Legal Claim:

295.   Forces beyond Plaintiffs' control, such as lack of affordable housing and emergency shelter, disability, and unemployment, have compelled Plaintiffs to live, sleep and take care of basic human needs in public.

296.   Activities such as sleeping and using the bathroom are essential life-sustaining functions for everyone.  When performed inside, they are unquestionably considered legal.  However, the CITY is punishing homeless persons for the very same life-sustaining actions they are forced to perform in public spaces.  Without access to shelter or public restrooms, homeless persons have no choice but to conduct these activities in public in order to survive.

297.   Defendants' policy, practice and/or custom of harassing, arresting, and incarcerating involuntarily homeless persons for life-sustaining activities such as

public urination/defecation at times and places no public bathrooms are open, available and accessible to homeless individuals constitute punishment of Plaintiffs and putative class members based on their status as homeless persons and, as such, is cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution.

## COUNT 10

### Violation of the right to be free from unreasonable search and seizure
### 4th Amendment, U.S. Constitution
### 42 U.S.C. § 1983

298.   Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

Defendant's Policies, Practices, and/or Customs:

299.   Defendant CITY has a policy, custom and/or practice of: (a) stopping Plaintiffs and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave under threat of arrest in public places where they are lawfully allowed to be in a concerted effort to intimidate homeless people into departing from the area.

Specific Allegations as to Plaintiffs' Facts:

CATRON

60

300.   SPPD officers frequently stop CATRON without reasonable suspicion of criminal activity and demand that he produce identification.

301.   SPPD have searched CATRON without probable cause when they have stopped to check his identification, particularly when he did not have identification to produce to the officers.  SPPD officers have told him that he would be arrested if he refused to let them search him.

302.   CATRON has been told to leave various areas throughout the CITY by several different SPPD officers.  Sometimes when he has been trying to sleep on public sidewalks or other public areas in the CITY, he has been woken up by SPPD officers and told he needs to move to a different place or he would be arrested.

LILE

303.   When LILE has slept on public sidewalks in front of City Hall, he has seen SPPD officers kick at homeless individuals' feet in the mornings and tell them that they need to get up and leave the area or be arrested.

304.   Officers from the SPPD have stopped LILE without reasonable suspicion of criminal activity and demanded he produce his identification. When LILE has been with a group of homeless individuals, police officers have asked everyone in the group to produce identification and/or police officers have singled out certain members of the group to check their identification even though they were not doing anything illegal.

SHUMATE

305.   SPPD officers have stopped SHUMATE without reasonable suspicion

of criminal activity and demanded that he produce identification when he has been in public areas including public parks. During these stops, SHUMATE has been searched by police officers from the SPPD without probable cause and without his consent.

306. After St. Petersburg City Code § 20-82 which prohibits sleeping, lying or reclining in rights-of-way during daylight hours, was enacted in January 2008, SHUMATE and other homeless individuals sleeping on public sidewalks near City Hall were told they can not be there until sunset and must leave before sunrise or face citation or arrest under the ordinance. In the mornings, SHUMATE has had police officers from the SPPD kick his feet and the feet of other homeless individuals to wake them up and tell them to leave the area or be arrested.

307. Defendant has a policy, practice and/or custom of using the anti-sleeping ordinances (§§ 20-74, 20-75, 20-76 and 20-82) to intimidate and threaten Plaintiffs and putative class members into vacating public areas in the CITY under threat of arrest. These ordinances are attached as Exhibits P.

308. Plaintiff Catron and putative class members have been told by police officers from the SPPD that they need to go to a shelter or vacate public sidewalks at night even when there is no shelter space available.

309. Plaintiff LILE and putative class members have been told by police officers from the SPPD that they are not allowed to "recline" on the public sidewalks during the daytime, and are told they must either sit up straight on the sidewalk or be arrested.

310.   Plaintiff SHUMATE and putative class members who sleep on public sidewalks, such as in front of St. Vincent de Paul or near City Hall, are woken up in the mornings at or around sunrise by police officers from the SPPD who tell them they need to get up and leave the area or they will be cited/arrested under § 20-82 of the City Code.

311.   Named Plaintiffs CATRON, LILE, SHUMATE   and putative class members have been stopped by SPPD officers without reasonable suspicion while they were in public areas such as public sidewalks, parks, or areas near homeless service providers and the police have demanded their identification under threat of arrest.

312.   Named Plaintiffs CATRON, SHUMATE and putative class members have been stopped by SPPD officers and had their personal belongings searched, without probable cause, in an effort to find a basis for arrest.

313.   SPPD officers order Plaintiffs and putative class members to leave public places where they are lawfully allowed to be in a concerted effort to intimidate homeless people into departing from the area.

Legal Claim:

314.   Defendant CITY's policy, custom and/or practice of: (a) stopping Plaintiffs and the putative class without any reasonable suspicion of criminal activity and asking for their identification under threat of arrest; (b) searching the possessions of Plaintiffs and the putative class who have been stopped without probable cause; and (c) directing Plaintiffs and the putative class to leave public places where they

are lawfully allowed to be under threat of arrest in a concerted effort to intimidate homeless people from departing the area violate the Fourth Amendment rights of Plaintiffs and the putative class to be free from unreasonable searches and seizures, as guaranteed by the U.S. Constitution.

## COUNT 11

**Violation of the right to intrastate travel
Article I Section 2, Fla. Constitution;
28 U.S.C. § 1367(a)**

315.    Plaintiffs reallege and incorporate by reference as though fully set forth here the allegations contained in paragraphs 3-5 (regarding Jurisdiction and Venue); paragraphs 6-15 (regarding the Parties); paragraphs 23-40 (regarding Homelessness in the CITY); and paragraph 41 (regarding Municipal Liability).

Defendant's Policies, Practices and/or Customs:

316.    Defendant CITY has a policy, custom and/or practice of arresting, citing, harassing and otherwise interfering with homeless people for engaging in the ordinary and essential activities of daily life in the public places where Plaintiffs are forced to live due to lack of available emergency shelter and affordable housing.

317.    Defendant CITY has a policy, custom and/or practice of conducting property sweeps and seizures on public sidewalks, in public parks, and in other public areas throughout the CITY pursuant to Section 8-321.

318.    Defendant CITY has a policy, custom and/or practice of enforcing Section 8-321 against homeless individuals to limit the amount of belongings they are

allowed to own and have with them in public parks, on streets, sidewalks and other public places where they live.

319. Defendant CITY has a policy, custom and/or practice of arresting or citing Plaintiffs and the putative class for life sustaining activities such as public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) at times and places where there are no public bathrooms open, available, and accessible to homeless people.

320. Defendant CITY has a policy, custom and/or practice of seizing property from homeless individuals if they are not able to demonstrate that they are able to carry all of their belongings at one time.

321. Defendant CITY has a policy, custom and/or practice of seizing "unattended" property from CITY parks. Defendant CITY interprets the term "unattended" to mean that the owner has to be with his property at all times and no one may attend to or watch over another individual's property.

322. Defendant CITY has a policy, custom and/or practice of utilizing municipal ordinances and state trespass laws to arrest, cite, harass and otherwise prohibit Plaintiffs and the putative class from being in public spaces, particularly municipal parks, for the purpose of driving them from public areas.

323. Defendant CITY has a policy, custom and/or practice of enforcing the trespass laws to prohibit Plaintiffs and putative class members from being present on public sidewalks surrounding public parks, waiting for buses at bus shelters located

on public sidewalks surrounding public parks, and using public bathrooms located inside public parks.

324.   Plaintiffs and putative class members are homeless and do not have access to private property to store their personal belongings.

325.   Plaintiffs and putative class members have had personal property removed from CITY parks and other public areas or have been told by SPPD officers that they are not allowed to have certain property with them in public spaces.  This has resulted in temporary and/or permanent deprivation of Plaintiffs' and putative class members' property.

Specific Allegations as to Plaintiffs' Facts:

326.   Putative class members have been cited and/or arrested under § 8-321 for unlawful storage of personal property on public property.

327.   Plaintiffs and putative class members fear either the CITY will confiscate their property or cite and/or arrest them for violating this ordinance if they remain in public spaces in St. Petersburg with their belongings.  Enforcement of Section 8-321 leaves Plaintiffs and putative class members with no place to go within the City of St. Petersburg if they cannot properly carry or store their personal belongings.

328.   Plaintiffs and putative class members are homeless and do not have access to private restrooms at times when public restrooms are closed or unavailable to them.

329.   Plaintiffs and putative class members are prohibited from conducting

the life sustaining activity of public urination/defecation in the CITY when and if public restrooms are unavailable to them.  Such prohibitions leave Plaintiffs and putative class members with no place to go within the CITY when they must engage in such life-sustaining conduct.

<u>Legal Claim</u>:

330.   The right to intrastate travel is a fundamental right under the Florida Constitution, Article I, Section 2.

331.   Defendant CITY's policies, practices and/or customs described above burden Plaintiffs' and putative class members' fundamental right to intrastate travel, as guaranteed by the Florida Constitution, Article I, Section 2.

332.   Defendant CITY's policies, practices and/or customs described above fail strict scrutiny review as they are not narrowly tailored to serve a compelling governmental interest in violation of the Florida Constitution, Article I, Section 2.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    A preliminary and permanent injunction, enjoining Defendant CITY from interfering with Plaintiffs' and putative class members' constitutionally protected rights under the First, Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution and Article I, § 2 of the Florida Constitution.  Specifically, to enjoin Defendant CITY from:

a.    Issuing trespass warnings for public property, including public parks, pursuant to City Code § 20-30;

b.     Arresting individuals for trespass after warning under Fla. Stat. § 810.08 and 810.09, pursuant to trespass warnings previously issued for public property under City Code § 20-30;

c.     Arresting homeless individuals for public urination/defecation under City Code § 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) when there are no public bathrooms open, available, and accessible to homeless people;

d.     Enforcing provisions of City Code § 8-321 related to outdoor storage on public property;

e.     Stopping homeless individuals and demanding production of identification without reasonable suspicion of criminal activity while they are simply standing or walking on public streets and sidewalks;

f.     Searching possessions of homeless individuals without probable cause;

g.     Ordering homeless individuals under threat of arrest to move along from public places where they are lawfully allowed to be;

2.     For a declaration that City Code Section 8-321, is facially unconstitutional under the Fourteenth Amendment of the U.S. Constitution;

3.     For a declaration that City Code Section 8-321 is being applied unconstitutionally to Plaintiffs and putative class members under the Fourteenth Amendment of the U.S. Constitution;

68

4.     For a declaration that City Code Section 20-30 is facially unconstitutional in violation of the First and Fourteenth Amendments of the U.S. Constitution;

5.     For a declaration that City Code Section 20-30 of the City Code is being applied unconstitutionally to Plaintiffs and putative class members in violation of the First and Fourteenth Amendments of the U.S. Constitution;

6.     For a declaration that arresting Plaintiffs and putative class members for engaging in life-sustaining activities such as public urination/defecation under City Code Section 20-123 (public urination/defecation prohibited) or Fla. Stat. 877.03 (disorderly conduct) when there are no public bathrooms open, available, and accessible to homeless people is cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution;

7.     For a declaration that Defendant CITY's past, present, and threatened future actions violate Plaintiffs and putative class members' rights to freedom of speech and expression under the First Amendment; rights to be free from unreasonable searches and seizures under the Fourth Amendment; right to be free from cruel and unusual punishment under the Eighth Amendment; right to travel under Article I, § 2 of the Florida Constitution; and right to due process of law under the Fourteenth Amendment;

8.     For attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

9.     For such other relief as this Court deems just and proper.

Dated this 15th day of December, 2009.

Respectfully Submitted,

___/s/ Alice K. Nelson_____
Alice K. Nelson, Fla. Bar No. 211771
alice.nelson@southernlegal.org
Kirsten Clanton, Fla. Bar No. 17179
kirsten.clanton@southernlegal.org
Neil Chonin, Fla. Bar No. 13428
neil.chonin@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Ave.
Gainesville, FL 32601
(352) 271-8890
(352) 271-8347 (fax)

Peter P. Sleasman, Fla. Bar No. 367931
psleasman@filsinc.org
Florida Institutional Legal Services, Inc.
12921 SW 1st Road, Ste. 107, #346
Newberry, FL 32669
(352) 375-2494
(352) 331-5202 (fax)

Catherine A. Bendor, D.C. Bar No. 442437
cbendor@nlchp.org
Tulin Ozdeger, D.C. Bar No. 476548
tozdeger@nlchp.org
National Law Center on Homelessness & Poverty
1411 K St., NW, Suite 1400
Washington, D.C. 20005
(202) 638-2535
(202) 628-2737 (fax)

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was furnished to all counsel of record via the Court's Electronic Filing System on this 15th day of December, 2009.

/s/ Alice K. Nelson_____
Attorneys for Plaintiffs